NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:19-CV-80822-DMM

NORMAN D. MANNING
and
JANET S. MANNING, individually,
and as Assignees of
MAX KARL MOHR and EDIT GYURITZA,

Plaintiffs,

vs.

PROGRESSIVE AMERICAN
INSURANCE COMPANY,

Defendant.

_____/

DEPOSITION OF:      DOUG HELTON

DATE:               December 16th, 2019

TIME                9:57 a.m. - 12:48 p.m.

LOCATION:           Echelon Pointe/Regus
                    970 Lake Carillon Drive
                    Third Floor, Suite 300
                    St. Petersburg, FL  33716

STENOGRAPHICALLY
REPORTED BY:        LISA SELBY-BROOD, RMR,
                    Registered Merit Reporter and
                    Notary Public,
                    State of Florida at large.

APPEARANCES

STEPHEN A. MARINO, JR., ESQ.
Ver Ploeg & Marino, PA
100 SE 2nd Street, 30th Floor
Miami, FL  33131-2151
SMarino@vpm-legal.com
(305) 577-3996

          Counsel for the Plaintiffs


JOSEPH T. KISSANE, ESQ.
Cole, Scott & Kissane, PA
4686 Sunbeam Road
Jacksonville, FL  32257
Joe.Kissane@CSKlegal.com
(904) 672-4000

          Counsel for the Defendant


ALSO PRESENT:

Kelly McAuley, Esq. In-house Counsel, Progressive


Rob Williams, Videographer

I   N   D   E   X

PAGE

December 16th, 2019

DEPOSITION OF:        DOUG HELTON

        Direct Examination by Mr. Marino          4
        (No cross Examination)


        ERRATA SHEET                              126
        CERTIFICATE OF OATH                       127
        CERTIFICATE OF REPORTER                   128


                *   *   *   *   *


        E   X   H   I   B   I   T   S

Plaintiff's Exhibit 1                             124
(Letter, August 23rd, 2017, Sheffield/Grife)

Plaintiff's Exhibit 2                             124
(Letter, March 28th, 2018, Wilke/Grife)


                - - -

(Formalities for videotape; not reported)

DOUG HELTON,

the witness herein, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

(9:57 a.m., on the record.)

BY MR. MARINO:

Q    Good morning, sir.

A    Good morning.

Q    My name is Stephen Marino, and I represent the Plaintiffs in this action.  Have we met before?

A    I don't believe so.

Q    I don't believe so, either.

Can you introduce yourself for the record, please.

A    Yes.  My name's Douglas Helton.  I'm the Casualty Director for Progressive for the State of Florida.

Q    H-E-L-T-O-N?

A    Correct.

Q    And what is a Casualty Director?

A    Well, my department handles injury claims, third party injury claims, first party injury claims for Progressive customers for the State of Florida.

Q    Who do you report to?

A    I report to Joyce Richardson, who is a Senior Director.

Q    And first, in a general sense, who reports to you?

A    In a general sense.

So the injury adjustors -- I have about 150. So I have managers report to me, supervisors report to the managers, and then the adjustors report to the supervisors.  That's kind of the structure.

Q    Are you a licensed adjustor in Florida?

A    Yes, I am.

Q    How long have you been a licensed adjustor in Florida?

A    Oh, over 30 years.

Q    Has your license been continuous --

A    Yes.

Q    -- during that time period?

A    Yes, it has.

Q    Ever been suspended or had a complaint against your license?

A    No.

Q    Have you ever been deposed before?

A    Yes, I have.

Q    On how many occasions?

Huseby, Inc.  Regional Centers
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
800-333-2082

A    I don't recall.

Q    More than five?

A    Yes; more than five.

Q    More than 10?

A    Yes.

Q    More than 20?

A    Yes.  My previous depositions were in my role as a Medical Process Director, so I dealt with a lot of PIP claims.  And PIP in Florida is very litigious, so I was deposed a number of times in the PIP arena.

Q    Let's break that down, then.

     You were the Casualty Director as of when?

A    That was probably January, four or five years ago.  I don't remember the approximate date.

Q    January of --

A    Of 2015, '16; somewhere around there.

Q    I don't know.  It's your career, sir.

A    Yeah.  Approximately, I said.

Q    Where would you go to figure out what your date of transfer was?

A    Oh, I could look in our system and see the exact date, if I needed to.

Q    And prior to being a Casualty Director, were you employed by Progressive?

A    Yes, I was.

Q    And what was your role or roles in general at first?

A    Okay.  Well, the role I had before this role was the Medical Claims Director for Florida.  So first party medical claims, I did that job for about 12 years.

Before that I was a Regional Claims Manager in our field claims organization.  And I managed approximately seven claims branches, and I probably did that for 14 years.

And then before that I was an Adjustor for about two years.

There were some steps in management in between there, but that's approximately my career history.

Q    So 32, 33 years with Progressive.

A    34, if you want to pin it down.  Am I close?

Q    I think we're off by -- I think somewhere I'm missing two years, but it's probably not the end of the world.

34 years ago you began with Progressive.

A    Correct.

Q    And prior to that, did you have experience in the insurance industry?

A    Prior that I was in graduate school.

This was my first job.  My first career-type job.

Q    What were you in graduate school for?

A    MBA.

Q    Where?

A    Went to University of West Florida.  Before that I went to University of Ohio for a couple of years, and before that I went to University of Cincinnati for a couple of years.

Q    University of Ohio.  Not The -- capital T -- Ohio State University.

A    No.  Ohio University.

Q    Okay; good.  34 years with Progressive.

You indicated many of your depositions took place while you were the Medical Claims Director.

A    Correct.

Q    And if we had to estimate within 10 or 20, what would we say the number of depositions is?

A    Oh, I don't know.  Probably 40, 50; something like that.

Q    The rules are generally the same; I just want to make sure that we're clear.  I don't think I have to fully instruct you, but let's just be careful.  I know we have a video, but the court reporter sitting between us has to write down what we say, so let's be careful not to talk over each other.

Sometimes, to use the right lexicon, use the

same words and verbiage, I'll have a pregnant pause in my question. If you could just hear me out and then answer the question, we'll have a cleaner record. Fair?

A    I agree.

Q    You indicated that you have had a continuous license for over 30 years. Do you have to take Continuing Education as part of maintaining that license?

A    Yes, I do.

Q    Does Progressive offer Continuing Educational courses internally?

A    I'm not sure. They may.

Q    Does Progressive have law firms come in from the outside to give education courses?

A    Yes.

Q    Have you attended some of those?

A    Yes.

Q    Do some of those involve law firms coming in to speak to you about Continuing Education issues?

A    Yes.

Q    Has Mr. Kissane's law firm ever come in and spoken to you or a group that you're in about Continuing Education issues?

A    No.

Q    Have you ever been to Mr. Kissane's boot camp?

A    I haven't been to his boot camp, but I did attend one of his services that they offer to our group.

It wasn't Continuing Education; it was just additional training for adjustors.

Q    I think you have it in front of you there, is a deposition notice that was issued for today.

Is that the piece of paper that you have there?

A    Yes.  This is just the first three pages, really.  I grabbed it because it had the address and I've never been here before.  But it doesn't have the attachment, if you're referring to the attachment.

Q    Okay.  I just want to confirm there are nine topics on the Schedule A.

A    Okay.

Q    And I want to confirm that you're here to speak on behalf of Progressive as to those nine topics.

As with any document, if I hand it to you, take the time to review it before you answer questions.

A    Okay.

Yes.  I've looked at this, and I'm here for these nine topics.

Q    All right.  Thank you.

What did you do to prepare for today's deposition?

A      I did read through some claim notes -- the redacted claim notes, and I spoke with defense counsel.

Q      Anything else?

A      I looked at some of the documents that's contained within the file, and that was it.

Q      Okay.  Let's talk about the claim notes for a second.

I'm going to hand you a batch of documents that I think is Bates numbed Progressive 53 -- hopefully continuously -- no.  Can't be.

Looks like 53 through 88, and then 1280 through 1374.  But that's not right, 'cause that has a letter in it.

I'll give you that batch.

The heading on what's Bates numbered Progressive 53, but looks like it has a 1 at the bottom center?

A      Sure.  The first page?

Q      Yeah -- is claim notes.  So that's the terminology you guys use at Progressive for electronic notes that you enter into a file somewhere?

A      Correct.

Q      Let's talk about the file.

What is the claim file -- strike that; I apologize.

Whom are you employed by; do you know?

A   You know, I'd have to check.  It's one of the Progressive companies.  I believe it Progressive Casualty Insurance Company.

Q   In the scope of your employment, do you address claims by other -- made against other Progressive entities, or --

A   Yes.

Q   I was going to say, or against insureds of other Progressive entities.

A   Yes, I do.

Q   When I say Progressive I'm trying to use shorthand, but I want to make sure there's no distinction I'm missing.

Who is the carrier who issued the policy in this case?

A   I don't recall.  I don't think I looked at that.

Q   I have it as Progressive American Insurance Company.  Does that sound about right?

A   It could be; I just didn't look into the file to see which underwriting company wrote this specific policy.

Q   And that was sort of my question.  There are a number of underwriting companies.  That doesn't affect

the broader questions of claims handling or processes; does it?

A    No.  Not in general terms.

Q    Right.  There's no claims handling guidelines for Progressive American that might be different from Progressive Casualty or Progressive Select, or something like that.  Fair?

A    No.  No.

Q    My question ended with a "fair", so we have to be careful not to talk over each other.

But the answer to my question is that there are no separate claims guidelines or claims manuals for the individual underwriting companies.

A    Not in general terms.  There may be different claims handling for a boat policy or a tractor trailer policy or a motor home.

But for the auto portion, there isn't different for the different companies.

Q    Okay.  So absent unique underwriting, when I say Progressive, I'm not -- misspeaking for not identifying which Progressive underwriting entity is referenced in our conversation.  Is that fair?

A    Yeah, that's fair.

Q    So what does the claim file consist of at Progressive on an auto claim like this?

A    Well, in general it's a file of documents that are collected during the investigation of the claim, copies of any checks that are issued -- and they're put in their electronically -- as well as documentation as to what the adjustor did in the handling of the case.

Q    Am I correct that Progressive is a paperless company?  They don't have physical files being kept any more?

MR. KISSANE:  Object to form.

THE WITNESS:  No, we have physical files.

BY MR. MARINO:

Q    Okay.

A    I wouldn't characterize it as paperless, although we're moving in that direction.

For my work crew, a lot of it is still physical documents; paper.

Q    And where are those stored?

A    Well, that would be stored in a physical claim file if there was one, for this claim.

Q    How would we know whether there was one or not?

A    Well, you would ask the adjustor handling the case, or we can look to see if there was a physical file.  They're filed by claim numbers with Iron Melton (phonetic spelling.)

NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019                                      Page 15

Q    They're kept off site?

A    Yes.  I mean, some are kept on site that are most recent for a quick reference.

After a certain period they're shipped offsite to Iron Melton (phonetic).

And I don't recall the time frame of when they're shipped offsite.  I think it's based on how much physical space we have to store on site.

Q    You have electronic claim notes.

Do you also have physical, handwritten claim notes?

A    No.

Q    You have documents that are created by Progressive and sent out.

Are there photocopies of originals or scans of originals of those outgoing documents kept, or is just the electronic format kept?

A    If they're sent out to be scanned within the claim, they're not kept.  They're kept for a very short period of time, and destroyed.

Q    How is that short period of time defined?

A    I don't recall exactly what the period of time is.  They go to an off-site vendor who scans them in, and then at some point they destroy them.  But it's a relatively short period of time.

But I don't recall what the number of days.

Q   So it's days.

A   I think it is.

Q   Not years.

A   It's not years.

Q   Okay.  My recollection a long time ago, was there's a campus around the Tampa area for Progressive, and for many of their letters there's an electronic communication that goes to someplace else in Tampa that prints them, a machine puts them in an envelope, and they get sent to the post office.  Those obviously never get hand signed, and an original copy is not kept and scanned.

That was sort of the framework for my question.

So is the system different now, where somebody hand signs -- an adjustor will hand sign a document and then submit it to a group -- an outside vendor or an internal group -- to have it scanned for the file?

A   Yes.

Q   Okay.  And when did that start; do you recall?

A   That probably started maybe eight years ago.

Q   So if a letter on a claim that had some level of importance with regard to the claim was sent out, somewhere in the claim file there'd be a scan of the

actual original document going out.

A   There could be, depending on the time frame. The adjustors have the availability now -- most recently I think within the last two years -- to upload a document into the claim file directly.

Previous to that they were sent off site, scanned, put back in, and uploaded.

Q   And I limited my question to outgoing documents.

A   Right.

Q   So now it's incoming documents; what comes in -- my question now turns to incoming documents.  A letter from a claimant or a law firm or a health care provider, that document comes in.

What's the process to get that into and made part of the claim file?

A   Well, I think it could be sent externally to a third party vendor that can scan it and send it back to the claim, or we have the availability to have a clerical person fax it back to us into a PDF file, and the adjustor can directly upload it, or an admin person can directly upload it.

Q   I'm hearing the emphasis being on electronic capture of that document.  There's not a written or a paper file somewhere that's distinct from and not

inclusive of documents in an electronic format.

Correct?

A    There could be.  I mean, they have the availability to upload the documents, to send it to a vendor to have it upload, but I can't tell you whether or not on a specific claim that adjustor kept a hard copy file -- which would be the physical file.  And I don't know in this particular case if there was a physical file.

Q    What is the adjustor supposed to do?

A    Most recently, like within the last couple of years, we ask that they upload the documents, because they can do it directly now, or through an admin person.

Previous to that, there was a hard copy file, because -- and a lot of cases they wouldn't send them off to a vendor to be scanned; they would just keep a file.

Q    The claim we're here about today is just about -- took place just about three years ago, and it came to Progressive's attention a little bit less than three years ago.

So are you saying there's a distinction in the beginning of 2017 that may be different from how it's handled now?

A    There could be.  I just don't know.

I mean, I couldn't say with confidence that there was or was not a physical hard file, because I didn't research that. That wasn't one of the things requested, I think.

Q What is the name of the claim management software that Progressive uses for the maintenance of files and the creation of files?

A Claim Station.

Q Claim Station?

A Correct.

Q Is that an outside purchase, or a proprietary?

A It's proprietary.

Q Do you personally have any involvement in creating Claim Station?

A No.

Q Does Progressive have claims handling guidelines for auto claims like this?

A Yes. We have claims standards.

Q Claims standards.

And where are those claim standards kept?

A Those are kept on a shared server that anyone can access that has access to Progressive's proprietary websites.

Q Do you have or have you had any involvement in creating or modifying those claims standards?

A     Probably somewhere around 10 years ago I was on a committee with a group of other individuals that were tasked with updating those claims standards.

So I was involved in writing certain portions of the claim standards.  They were the medical portions.  Because at the time I was in charge of the medical claims group, so I was involved in a team that reassessed and rewrote those documents.

They were basically just updated.

Q     They were updated as of when?

A     I don't remember the approximate date.

It was somewhere close to 10 years ago, if I remember correctly.

Q     Okay.  So I thought you said just updated, which indicated --

A     No.  I -- I meant by that they were basically intact; we just updated them.

Q     Oh.

A     So just updated means we took the existing document and updated that document --

Q     I misunderstood you.

A     -- quite a long period of time.

Q     Are you aware of any updates since your involvement 10 years ago?

A     I'm not aware of any update, but I haven't

NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019
Page 21

researched it. There may or may not have been updates.

Q   Are you familiar with the claims standards?

A   Yes, I am.

Q   And do you know whether in the past three or four years they've changed?

A   I don't know they've made any changes.

Q   Do you know whether in the past three or four years they've been updated?

A   I don't know.

Q   Are you an attorney?

A   No, I'm not.

Q   Do you have any legal education?

A   Not any formal legal education, other than American Education System, which is basically a license you could get or a certification you could get for taking certain insurance courses.

But no, I haven't taken any legal courses, so to speak, to be an attorney.

Q   Did Progressive do anything -- well, you said you reviewed the file; correct?

A   Yes.  I looked at the claim notes maybe a week ago.

Q   And are the folks who were involved in the claim familiar to you?

A   Yes.  I know of them.

Q     You know of them?

A     Yes.   They didn't report directly to me.   They reported to their supervisor, who reported to their manager, who reported to me.

But I've been to the offices and I've said hi to them and talked to them informally.

Q     Where are you based out of?

A     Tampa.   Tampa/St. Pete.

Q     Is that the campus over here on 75?

A     On Westshore; yes.   But now I work out of the St. Pete office.   Office local.

Q     And the folks involved in the claim that we're here about, are they based in the West Palm office?

A     Correct.

Q     So have you ever directly reviewed any of them?

MR. KISSANE:   Object to form.

THE WITNESS:   Yeah, I'm not sure what you mean by reviewed.

BY MR. MARINO:

Q     The adjustors and these managers and supervisors, Progressive performs a periodic review of their performance; does it not?

A     Correct.   Correct.   They do, once a year.

Q     Have you yourself, in your capacity as

claim -- Casualty Director, performed a review of any of the people that were involved in this claim?

A    I've never performed any type of review, although once a year their managers, myself, Human Resources, my supervisor, we do sit through for purposes of merit increases, and we do talk through each adjustor's performance in a general basis.

But I don't physically review their work in preparation for that; there's too many people.  And I don't review their evaluations; we simply have a discussion of how this or that person is doing, and what we want to do as far as compensation.

Q    Would you be able to tell me who the person is at Progressive who reviewed the adjustors that handled this claim?

MR. KISSANE:  Object to form.

THE WITNESS:  Yes.

BY MR. MARINO:

Q    And who would that be?

A    That would be Evan Jarvis.

He was the direct supervisor.

Q    So the annual review for the folks who were hands on in this claim would have been performed by Mr. Jarvis?

A    Correct.

Q    And it's a written document; this review?

A    It is a written document in our computer system.  In other words, electronic.

Q    And how does it work?  Does it involve direct communication, is it self review, both?

How does it work?

A    It could be both.

They have a set of objectives that they're given at the beginning of the year, and then when Evan does the review he'll review their performance against their objectives.  And then at the end of each set of objectives there's a paragraph that's pretext.  It's a limited number of characters.  And he will edit into each paragraph his assessment of their performance at the end of each year.

And that's kept on our Human Resource data.  We call that HR express.

Q    Is there data kept on the claims severity for each of the adjustors?

A    No.

Q    Is there data kept for claims severity by a given office at Progressive?

A    Not by office; no.

Q    How is it kept?

A    Well, we do have what we call org codes.

NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019
Page 25

Org codes -- organizational codes.  So each pool of people may have an organizational code, and then we do collect data based on the overall organizational code, and that may include severity payments.

Q    So the -- no data is kept with regards to severity or average loss payout -- well -- strike that.

Do you measure average loss payout by adjustor?

A    Not that I'm aware of.

Q    So is it your testimony that there's no data kept by Progressive as to claims severity or average loss payout by adjustor?

MR. KISSANE:  Object to form.

Asked and answered.

THE WITNESS:  Yeah, I don't think I said it wasn't kept.  It's not that I'm aware of.  You know, it's a large corporation of 40,000 people, there's an entire IT department.

It's physically possible to keep that data.  I personally don't review that data or look at that data at an adjustor level.

BY MR. MARINO:

Q    Has anyone discussed with you the average loss payout for your group?

MR. KISSANE:  Object to form.

THE WITNESS:  I mean, from a marketing standpoint we do look at the average payout for each of the groups, and we do that because that influences whether or not they raise rates if severity is going up, or lower rates if severity is going down.  So it may be looked at.

BY MR. MARINO:

Q    Right.  What I asked you is if someone in the past two years had discussed with you the average -- the claims severity -- average claims severity for your group.

A    I mean, it does come up from time to time.  And again, usually it's in more of a marketing function, because it impact rates.

So I may have had discussions with various people as part of my capacity as managing the overall group, of what the severity level is.

Q    And who do you report to?

A    As I said earlier, Joyce Richardson, and she's a Senior Director.

Q    So you and Miss Richardson ever talk about the average loss severity for your group?

MR. KISSANE:  Object to form.

THE WITNESS:  We may have time to time.  Usually we talk about inventory levels and those

type things.  How quick we close claims.

But severity may come up.  And again, it may come -- it comes up most often in reserving and marketing -- go ahead.

MR. MARINO:  Go ahead.

THE WITNESS:  I think I've answered it; I was just going to repeat the answer.

BY MR. MARINO:

Q    Well, I don't want to cut you off.

But same question about average loss payout. Have you and Miss Richardson ever talked about the average loss payout within your group?

MR. KISSANE:  Object to form.

THE WITNESS:  We may have.  I don't recall any recent discussions, but we may have over time.

BY MR. MARINO:

Q    Have you had any conversations with Mr. Jarvis about the performance of the people working in his group?

A    Again, I probably have, because once a year, as I -- you know, articulated the process, I sit in a room with HR, my boss, and we go through each person to assess where their performance is, and what their merit increase is.

I do that once a year with all my people.

There's about 150 of them.

Q    Is Mr. Jarvis in that room with you, or are you sort of talking about him without him being there?

A    No, he is in the room.  We go through each of his individual employees.  I do the same thing with -- I have 23 supervisors, so we do the same thing with each supervisor.

Q    And as you sit here, do you recall whether on an annualized basis there's a reference to or discussion of either the average loss payout or the claims severity within a specific group, like Mr. Jarvis' group?

MR. KISSANE:  Object to form.

THE WITNESS:  No.

BY MR. MARINO:

Q    No, you don't recall, or no, it's not discussed?

A    No, that's not discussed.

It's not discussed whatsoever.

Q    Now, besides claim station, what other software is available to Progressive adjustors handling auto claims like the one we're here about?

MR. KISSANE:  Object to form.

THE WITNESS:  Can you repeat the question?

BY MR. MARINO

Q    Sure.  Besides claims station, what other

software packages are available in the Progressive universe to an adjustor handling claims like the one that we're here about.

MR. KISSANE:  Object to form.

THE WITNESS:  I don't personally handle claims, but we do use a number of research database -- like, Accurate is one -- that helps the adjustors find other insurance.  They may use databases to help track down people's addresses, their phone numbers.  You know, those type things. They may go into Facebook and -- you know, some of the social media, to see if a person is posting certain things there; if they're posting an injury claim.

BY MR. MARINO:

Q     Let me pause you, because I asked an imperfect question.  I didn't mean in the universe of the worldwide web --

A     When you said universe -- sorry.

Q     Right.  And that's why I said it was an imperfect question, so let me try again.

Progressive has its own intranet; right?  You said --

A     Correct.

Q     -- a shared server, as it were.

A    Yes.

Q    Within the confines of that shared server, things that are accessible only by authorized Progressive adjustors, besides claims station, what other software is there in that limited universe?

A    Well, in that universe they do have access -- as I said, the Accurate.  For our medical groups they use Mitchell Medical, which is a re-pricer to the statutory fee schedule.  They use Mitchell Physical Damage software, which helps them write estimates.  Let's see.

They have a software that RB group may use, it's L Nab, to bracket in injury evaluations.  There's probably more, but again, I don't adjust claims, so I'm not full -- exactly certain of the full body, but I think those are the major ones that I can recall.

Q    Would there be -- if an adjustor referenced a software package available through Progressive' shared server, would there be a reference to that in the claims notes?

A    Yes, there would be.

Q    Okay.  So if somebody adjusting a claim looked at L nab, for example, there would be indication of that in the claims notes.

A    Correct.

Q    What would it be called; that reference, or with it just say L Nab?

A    They use the acronym, L Nab.

Q    And if L Nab doesn't appear in the claim notes, is it fair to say they probably didn't go in and access that information?

A    Yes.  Unless they forgot to put it in there. We're dealing with people.

But in general, they do put that there.

Q    Or at least they're supposed to.

A    Correct.

Q    Is there a written set of procedures within that claims standards you referenced that sort of lay out the steps an adjustor's supposed to take when presented with a bodily injury claim in auto context?

MR. KISSANE:  Object to form.

THE WITNESS:  I haven't looked at them in a while, but I think they do lay out injury handling in general terms.

BY MR. MARINO:

Q    But not like a specific checklist, sort of -- these are the things you might need?

A    I don't think they're down to the detail level for each claim; I think they're listed for injury handling in general.

Again, I haven't looked at them in probably a year or so, that I can recall.

Q    Do those standards include a discussion of an adjustor's obligation to an insured, in the context of a third-party liability claim?

A    I don't think it provides it in detail, but I think it does in general terms.

Q    Would you agree with me that an adjustor has to act fairly towards the insured during the claim process?

A    Absolutely.

Q    That an adjustor has to act honestly towards the insured during the claim process?

A    Absolutely.

Q    That the adjustor has to act with due regard for the insured's interests during the claim process?

A    Correct.

Q    Do you agree that an adjustor in specific and Progressive in general, has an obligation to settle a third-party liability claim against its insured when under all the circumstances, it could and should do so?

MR. KISSANE:  Object to form.

THE WITNESS:  Yeah.  I think each case is handled on its own individual merits, but in a general sense if they should, could, then yes.  I

mean, that's what the adjustors do every day.

They settle claims.

BY MR. MARINO:

Q    And in the context of adjusting claims, not just settling, you'll agree with me that an adjustor should be keeping its insured advised as to what's happening with regards to the claim against the insured?

A    Yes.

Q    And if circumstances warrant it, the adjustor has an obligation to advise the insured of the potential for a claim in excess of the available coverage.

A    Correct.

Q    And the adjustor has an obligation to advise the insured of what steps it can take to avoid the imposition of an excess judgment.

A    Correct.

Q    How many of your depositions that you referenced earlier have been in the context of a bad faith claim?

A    I don't know.  Maybe two or three, total.

Q    How many in the past, say five years?

A    Past five years?  None.

Q    You have PIP bad faith claims?

A    Allegation of bad faith.

Q    Is there a legal department at Progressive?

MR. KISSANE: Object to form.

THE WITNESS: Yes.

BY MR. MARINO:

Q    And what do you guys call it in your terminology?

MR. KISSANE: Wait a second. Object to form. Go ahead.

THE WITNESS: Our claims legal department.

BY MR. MARINO:

Q    So if I say claims legal department or claims legal, you'll know what I'm talking about.

A    Correct.

Q    Within your claims standards, are there any procedures or guidelines that tell an adjustor when claims legal should be involved in the claim process?

A    We do have guidelines that are state specific.

Q    Okay. Well, in regard to Florida. Let's limit it to that.

A    Correct.

Q    With regard to Florida, I understand from Mr. Flemming's deposition that there are different context in which the claims legal department gets involved.

With regard to the deposition today, what is your understanding of the different circumstances that

would trigger involvement of claims legal in a given automobile liability claim?

A     I mean, it depends, and it varies by case.

In general terms, the claims legal department are consultants that are available to the adjustor, so they'll contact claims legal if they have any number of questions about releases or legal terminology or case law.

Or most commonly they'll consult with claims legal about demand letters where they're very complex and have multiple pages of conditions and requirements and timelines.

So in general terms, those are the most frequent contacts.  They may contact them as well in cases where they're doing a proactive tender.  They'll look at the packages and the documents, and they may look at releases.  But it depends.  Each scenario is different.

But in general, it's just a resource for the adjustors.

Q     Is there a specific guideline as to injury severity that would trigger involvement of claims legal?

MR. KISSANE:  Object to form.

THE WITNESS:  I mean, it depends on the case specific.  I mean, we handle 102 cases a day, and

NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019

Page 36

about 24,000 a year in my group, so there could be any number of scenarios that could possibly come up.

Again, it's a resource for the adjustors and leaders that are attorneys that they can consult with. I mean, we would be here for quite a while if I would try to think of every possible scenario that they may or may not contact one of our attorneys to discuss a case.

BY MR. MARINO:

Q I'll try to be more precise in my questions, because I appreciate your answer, but that's not what I actually asked.

A Okay.

Q Do the guidelines -- which are a written electronic document, if I understood your testimony -- do they have somewhere in them instructions that if injuries of a certain type occur, you need to talk to claims legal and get them involved?

MR. KISSANE: Object to form.

BY MR. MARINO:

Q That was my question. Not what are all the scenarios in which it might happen, but do your claims guidelines have a specific provision. If it's a beheading, a quadraplegia, paraplegia, etc., claims

legal has to be involved?

A    They do get involved in terms of severity of injury if it's a claim denial.  So we do contact our claims legal department if it's what we would term a serious injury, and we plan to deny the claim for coverage or liability.

Q    And is that your only circumstances under which you understand the claims standards give direction to the adjustor to involve claims legal?

A    Just to be specific, I don't believe those are in the claims standards.

I think that's Florida specific.

Q    Oh.

A    So they're two different things.

Q    Okay.  I think I understand now.  The claims standards are for the country?

A    Correct.

Q    Well, are there a separate set of standards for Florida?

A    We do have separate guidelines that we ask adjustors for Florida specific.  One of them does involve -- back to your question, if we would term the injury severe and we're denying coverage or denying liability completely, then we do consult with claims legal in that severity scenario.

On a day-to-day basis, we get a lot of claims that involve serious injuries, and they aren't consulted with claims legal.

But in that specific situation, we do ask adjustors to discuss it with the claims legal.

Q      You mentioned that claims legal gets involved to review releases.  Do you recall that?

A      Correct.  They may be involved in that.

Q      My understanding that -- is that one of the resources available to an adjustor is -- I don't know if it's Word, Word Perfect -- I don't know if Word Perfect even exists any more -- getting old -- but there is some Word processing software that has standard letters and standard release documents in it, and the release documents may be locked, so that all you can fill in is the name and such.

Is that your understanding of A, one of the resources available to an adjustor at Progressive?

A      Yes.  That's accurate.

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q      And how would the adjustor go about accessing that Word processing information?  Through the claims station?

A      Correct.  Through their laptop or computer.

Just access it.

Q    Okay.  And do the adjustors get training, in terms of which of the release options or which of the standardized letters they should be using?

A    Yes.

Q    How often does that training occur?

A    I don't know how often it occurs.

It's part of our on-boarding process.

On-boarding -- when a new adjustor is hired, you know, most of the folks that typically work for me are experienced adjustors; they've been here multiple years.

So when they're initially hired with the company, they go through some initial training, and then we set up the database with the releases for specific scenarios, so they do get training.

So if it's loss involving a minor, they'll use a certain release.  If it's a loss involving a Claimant that may have other insurance they'll use a certain release, and then there's a form letter that attaches to it.

Q    Okay.  Before a release and associated letter goes out, does the adjustor have to pass it by their supervisor?

A    It depends on the skill and the tenure of the

adjustor.  Tenured adjustors do not.

Q    Less-tenured adjustors should, or do?

A    I don't understand your question.

Q    You said a tenured adjustor does not.

A    Right.

Q    But I said but a less-tenured adjustor should or do have to pass it by their supervisor.

A    It depends on the assessment by the supervisor, or that person's skill set.  So in general terms, an experienced adjustor would not.  You know.  Probably the only caveat is if it's a proactive tender where there's been no formal demand ever received, no medical bills, anything of that nature, those we do ask our legal department to briefly look at.

Q    You've used a couple times the phrase "proactive tender."

When did Progressive start using this phrase?

A    I have no idea.

Q    Last year, two years ago, five years ago --

MR. KISSANE:  Object to form.

THE WITNESS:  I think it's a common term in the industry.  I couldn't pinpoint a date back in history when somebody began using that.  I mean, I'd have no idea; it's just a common term that's used, I think, industry wide with every company.

BY MR. MARINO:

Q    I've deposed a lot of adjustors over the years, and this is the first time I've heard it used so regularly and so frequently.

MR. KISSANE:  Objection to form.  That's a statement.  Wait a minute that's a statement; not a question.

MR. MARINO:  I wasn't finishing with my question.

MR. KISSANE:  I know, but you made a statement.  It's going to be improper anyway.

I apologize for interrupting.

MR. MARINO:  At least let me finish my improper question before you object to it.

BY MR. MARINO:

Q    I've deposed a lot of insurance folks over the years, and this is the first time I've heard it used so frequent and regularly, including Progressive.

So do you have any knowledge as to when it found its way into your personal lexicon?

MR. KISSANE:  Objection to the form of the question, and it's been asked and answered.

THE WITNESS:  No, I have no specific knowledge of when that word was used by Progressive or Progressive adjustors historically.

BY MR. MARINO:

Q    Who designs the little acronyms that get used, or the abbreviations that get used in the claims notes?

A    I don't think anyone specifically designs it. I think within Progressive the claim notes can be very long, and I think over time it becomes very common to use these abbreviated words instead of typing the whole word. But I don't know there's a person that comes up with any of these. I think they're passed on from adjustor to adjustor.

Q    Look at the bottom of Progressive 85, which is Page 32 of the claims notes.

A    I'm sorry; what page?

Q    Bates Numbered 85, but the claims notes number is 32.

A    Okay. I've got 32 here.

Q    Okay. If you look about two-thirds of the way down, it says will proactively tender policy. Then the next entry references P T E N D, which is proactive tender.

And then at the bottom there's R V W D -- which I think is "reviewed". P T N D R -- which I assume is proactive tender. So there's three references in three consecutive notes to this idea of a proactive tender.

Have you --

A    I haven't found it yet; I'm just reading through here.

Okay.  I do see where it says, "Will proactively tender policy limits --" is that what you're referring to?

Q    Yes.  And the next one makes a reference to P T N D R.

A    Proactively tender -- will continue to monitor and review injuries -- PT N D; is that it?

Q    Right.  And then below that, now there's a reference to R V W D.  The next entry down, I believe.

A    Okay.  I see it.

Q    At the bottom of the page.

A    Got it.

Q    It says R V W D.

A    I see that.

Q    PT D R, or something.

A    Okay.  The very bottom.  I see it.

Q    Yeah.

A    All right.  I see.

Q    When, to your knowledge, did the use of that phrase or acronym with regards to proactive tender become commonplace in Progressive's claims notes?

MR. KISSANE:  Objection.  Asked and answered.

THE WITNESS:  Yeah, I think I've answered that.  I have no specific knowledge of when they used the acronym, or the word.

For my experience within Progressive -- which has been my total experience -- it's a very common phrase we use.

I know you said that you haven't seen it before, but for Progressive it's a very common word.  And I don't know historically when it started or who came up with it; it's just a word that's pretty common.

BY MR. MARINO:

Q    Was it something Mr. Flayman (phonetic) started?

A    I could probably say with confidence that no, I'm sure it predates Mr. Flayman.

MR. MARINO:  Something predates Mr. Flayman?

THE WITNESS:  Yes.

BY MR. MARINO:

Q    I asked you about the reviews and evaluations of adjustors.  How does Progressive compensate its adjustors?

A    They get an annual review of their performance, and then we give them a merit increase. They also have a base salary, and they also have a gain

share participation.

Q   In laymen's terms what's a gain share participation?

A   It's profit sharing by the corporate entity with all the employees.

Q   So if Progressive as a family makes profits, the adjustors share in it.

A   It's more complicated than that.

It's based on a combination of profitability, growth, and then policy retention.  Keeping our customers.  And then it's a certain percent of your salary for all 40,000 employees, based on those annual numbers.

Q   Let me make sure I understand you.

The way the number is calculated is based on those factors, you said.

A   Correct.

Q   But from an adjustor's standpoint, they can influence some of those numbers; right?

A   No.  They would have no influence on any of those numbers.

Q   They just on their end receive, based on whatever formula Progressive is using, a profit sharing bonus.

A   Yeah.  It's just a piece of their

compensation.  And it could be nothing.

Q    In your 34 years, has it been nothing?

A    Yes.

Q    And what's the most it's been in your 34 years?

MR. KISSANE:  Object to form.

THE WITNESS:  Well, the program itself is capped at two times the percent for your job, so the most you can have is two times your percent for your specific role.  And I think that's happened twice in the history of Progressive.

BY MR. MARINO:

Q    And what's the percent for the role of an adjustor?

A    I don't recall.  I'm going to approximate maybe 8 percent.  I think it depends on the different job level -- and we have multiple job levels -- but I don't specifically recall what each job level provides as to the specific percent.

Q    Would it be fair to say that more experienced or the higher up the food chain you are, the greater the percentage?

A    I think that would be accurate.

Q    So when you say everyone in the company shares it, the folks who clean the floors are going to get a

small percentage, compared to the folks who make the big-picture decisions?

        MR. KISSANE:  Object to form.

BY MR. MARINO:

        Q    Fair?

        A    It's fair, because it's a part of their compensation.

        Q    You indicated that claims legal gets consulted to talk about terminology being used in -- I think you said letters and releases; is that correct?

        MR. KISSANE:  Object to form.

        THE WITNESS:  They could be consulted in any
    number of scenarios, including that.

        Primarily, as I testified, it's mostly demands
    that we receive from outside attorneys that are
    complex, with multiple pages of conditions.
    They're very complex and tedious.

        So those are primarily what the adjustors
    consult with the attorneys.

BY MR. MARINO:

        Q    And who has the final say in terms of what language to use in releases and the accompanying letters?

        The adjustor, the supervisor, or claims legal?

        MR. KISSANE:  Object to form.

THE WITNESS:  I don't think it's any of those.  I think it's the outside attorney.  Third party has the ultimate say.

We use general forms, but when we use general forms we always are very clear that it's not a condition to settlement, and that if anybody disputes any specific wording on a release, that we will certainly consider and accommodate that specific wording.

So I think the ultimate person that has the wording on the release is the claim we're trying to settle, and their attorney.

BY MR. MARINO:

Q    Okay.  I'm talking about outgoing.

A    Okay.

Q    Before the document leaves Progressive.

A    All right.

Q    Who has the final say, in terms of which release form and what language to be used in the release, and the accompanying letter?

MR. KISSANE:  Object to form.

THE WITNESS:  The release is simply forms.

So the adjustor uses the form as it is.  They're not attorneys; they can't draft it.  If they want to use other releases, they would consult

with our claims legal department, and seek their

input.

BY MR. MARINO:

Q    My question was, the adjustor, when they consult with claims legal about the language or the form of a release, and the form -- and the kind of terminology and the accompanying letter, is it your testimony that claims legal has the final say, in terms of what release form will be used and what language on a letter on its way out, as opposed to the adjustor?

MR. KISSANE:  Object to form.

THE WITNESS:  As I said, the adjustors aren't attorneys, so if they have a question about the release or the specific wording of the release, they would consult with claims legal, and they would give them the individual feedback, and make that determination.

So in that terms, yes, the claims legal department would be able to amended the release; not the adjustors.

BY MR. MARINO:

Q    Well -- and there's more than one form of release, depending on the circumstances.

A    Correct.

Q    Fair?

A    Yes.  I testified to that earlier.

Q    Yeah.

A    And that is correct.

Q    So the adjustor picks out which release he or she thinks is appropriate, and sends it to somebody for verification that that's the appropriate release to use.

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q    Right?

A    Not in all cases.  Again, it depends on the tenure and experience of the adjustor.

In general terms, if it's a proactive tender -- meaning there was no demand presented, no medical bills, no documentation of injuries that substantial -- they will review the release with our claims legal department.

So that's a scenario where they would consult with them.

If you're an experienced, tenured adjustor simply settling a routine claim, they may not consult with them.  They may just download the release, forward it to the attorney, and settle the case.

Q    How does Progressive define the term proactive tender?

A    Well, as I just said, that's a policy limit

tender that the adjustor decided to make without a formal demand being presented.

Q    In your previous answer I think you indicated there were other factors, like no medical records given or some other factors -- she said you can read it back if you want -- so that's why I asked what is the definition of a proactive tender in Progressive's lexicon, since you said the words, "the phrase has been around for a long time."  And your testimony is policy limits, tender without a demand by the third-party claim.

A    In general terms, that is correct.

Q    Is there a more specific definition you're aware of?

A    Not that I'm aware of.

Q    Is the phrase defined in the claims standards?

A    Not that I'm aware of.

Q    Has the claim been defined in any continuing education courses provided to you while you've been at Progressive?

A    I don't recall.

Q    Has the phrase been defined in any of the other services and presentations that law firms may give to Progressive as part of your continuing claim understanding and education?

A     Not that I'm aware of.  Not that I recall. I've been through a lot of seminars and trainings.

I don't specifically recall.

Q     I gave you the claims notes because I didn't want to have a memory test.  So I'm going to ask some questions.  If you want to review the claims notes to answer them for dates and such, please feel free to do so.

The date of loss on the claim that we're here about would be January 30, 2017; correct?

A     I don't believe that's in the claim notes, but I think that is correct.

Q     You don't know whether the claim notes reference an accident having occurred on January 30th, 2017?

A     It may.  I mean, there's 120 pages.

I did review the claim.  That sounds accurate.

Q     And Progressive had notice of it as of February 1st, 2017.

MR. KISSANE:  Object to form.

THE WITNESS:  Correct.  It was reported February 1st at just about 4:00 p.m.

BY MR. MARINO:

Q     Who is -- I don't want to miss pronounce the name -- T-H-I-E-R-R-Y-E, last name V-A-N-T-E?

A     He is a property damage adjustor with Progressive.

Q     Is he a seasoned or experienced adjustor?

A     I don't personally know Mr. Vante, so I don't know what his history is.

Q     Is he still employed by Progressive?

A     I believe he is, but I have no specific knowledge.  He's in a completely different department than I work in.

There's a couple of thousand employees in Florida, in our claims department.  So I don't have any specific knowledge of his performance or how long he's been around, or even if he's here.  I believe he is.

Q     In preparation for today's deposition, did you talk to any of the adjustors who were involved in the claim handling process?

A     No.

Q     Did you review any of the depositions of anyone who was deposed in this case?

A     I did briefly look at Miss Bertalonni's (phonetic spelling.)

Q     The claim notes include property damage, PIP, B I.  When someone like Miss Bertalonni looks at the claim notes, can she see all that?

A     Generally yes, she can see all that.

I think in certain cases where there's PIP involved in the same case as an insured, she probably can't see those.

Q    Why is that?

A    If it's the same insured; first and third party.

Q    Explain that, please.

A    Well, if the insured on the same claim has two competing claims, she probably couldn't see the medical piece, such as UM.  Those would be coded a certain way, and her TPX -- her ID may not have privy to those notes.

But other than that, she would have the liability, the subrogation -- which is this -- the salvage, which is this, the total loss handling; all those other notes.

Q    Am I correct that there are separate adjustors for PD and BI?

MR. KISSANE:  Object to form.

THE WITNESS:  In most cases; yes.

BY MR. MARINO:

Q    And that's property damage and bodily injury, just for the folks who don't know all the terminology.

A    Correct.

Q    So the property damage adjustor can see what the bodily injury adjustor's writing in the claim notes,

and vice versa.  Correct?

A    Correct.

Q    So as of February 2nd, Progressive had knowledge of how the accident occurred.

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q    Fair?

A    We had general knowledge on February 2nd of what happened.  Like, a general description.

Q    Who is Sandy Manning?

A    Are you referring to a specific note that you want me to look at?

Q    Sure.  I didn't know if you knew the answer independently, but I'm happy to show you a note.

Claim note Page 3, Progressive 55.

At the bottom there are three entries by Mr. Vanti.  One is injury update for Norman Manning, and the next one is injury update for Sandy Manning.

A    Okay.  So that appears to be the passenger in the other car that was involved in the accident with our insured.

Q    Are you referring to Janet Manning?

A    Yeah; it must be Janet Manning.

Q    So that's a typographical error?

A    I didn't enter that, so I don't know.

I mean, the adjustors handle a lot of claims with a lot of people. For some reason this adjustor typed Sandy; I couldn't speculate on why.

Q     You referenced a large number earlier. How many claims on average is a B I adjustor working in your group handling?

MR. KISSANE: Object to form.

THE WITNESS: It depends on the role in the group.

BY MR. MARINO:

Q     Okay.

A     If they're handling litigation, it may be upwards of 100, maybe 120. If they're in the help group, which I believe Sabrina was in, it's probably 60 to 80.

Q     What's a help group?

A     It's just an acronym we use where the case comes in where there's an allegation of a more serious injury, it goes to a certain group that has the experience and tenure to handle that claim, versus in this scenario, property damage adjustor.

Q     Are you familiar with some of the acronyms used here? The last entry by Mr. Vanti on that page, OB call to C.O.D.?

A     Yes; I'm familiar with that.

Q    OB is, I think, "outbound."  What is C.O.D.?

A    Claimant owner driver.

Q    Okay.

A    So in this case it would be Norman Manning.

MR. KISSANE:  It would be Claimant other driver; right?

THE WITNESS:  General terms I believe it's Claimant owner driver.

Could be Claimant other driver.

MR. KISSANE:  Okay.

MR. MARINO:  You going to testify now?

MR. KISSANE:  No.  I'm helping you.

BY MR. MARINO:

Q    And the next page, the entry is outbound SMS sent to C.O.D. and CG.

SMS is like a text; is that what that is?

A    I would interpret it as a text.

Q    And what is C.O.D. and CG?

A    Could be Claimant owner or other driver, and Claimant guest passenger.

Q    So in that case, Mr. Vanti is trying to contact Mr. and Mrs. Manning.

A    Correct.

Q    And we know now the reason that the reason they weren't responding is because they were both in the

hospital at that point.

    MR. KISSANE:  Object to form.

BY MR. MARINO:

    Q    True?

    A    I assume so; yes.

    Q    Now, there's a reference here.  You had said
something about PIP, and I was curious about that.

    Middle of Page 4, it says PIP, February 2nd,
2017, Shorna, S-H-O-R-N-A, Bailey, and it says, "Review
new claim, qualifies for managed contact process."
Managed contact process.  What is that?

    A    That I don't know.

    Q    You're not familiar with the phrase "managed
contacted process"?

    A    I can make an assumption.

    I mean, I assume it means that the managed
contact process is the steps they would go through to
contact the party.  Like, they managed contact
process -- which is call their cellphone, call their
work phone, send a letter to their home, possibly go to
their home if need be, try to get their phone number or
better information through a third party.

    Q    The next entry looks like it says I B, which I
think is inbound -- call from CC attorney.  Who's CC?

    A    General terms, that's the Claimant Carrier

attorney.

Q    So an attorney for --

A    That would be the attorney for the Mannings, I believe.  Or it could be the attorney for our insured. I mean, it's not specific to a name, so I'm speculating.

Q    Well, is the purpose of a claim note to help other people on the team know what's going on, and know how things are being handled?

A    Yes.  It's specifically to document as best they can in general terms the handling of the case.

MR. MARINO:  All right.  We've been going about an hour.  Want to take a break?

MR. KISSANE:  Whatever you want to do is fine.

MR. MARINO:  Sure.

THE VIDEOGRAPHER:  Going off the record, the time is 11:07.

(Brief recess taken, 11:07 a.m.)

THE VIDEOGRAPHER:  We are back on the record; the time is 11:20.

BY MR. MARINO:

Q    Sir, were you directly involved in the Manning's claim against Progressive's insured?

A    Not that I'm aware of.

Q    Did you have any day-to-day or active participation in any decision making with regards to the

Manning's claims to against Progressive's insured?

A    Not that I recall.

Q    Is it fair to say, then, that your knowledge about what happened in the claim is based on your review of the claim file?

A    That is correct.

Q    And conversations with counsel?

A    Correct.

Q    1-30-17, accident.  2-01-17, report.

And by February 3rd, '17, Progressive was made aware that Mr. Manning was severely injured, and Mrs. Manning was severely injured and at the hospital still.

MR. KISSANE:  Object to form.

THE WITNESS:  Is there a specific claim note you want me to look at?

BY MR. MARINO:

Q    I'm just asking in general terms.  You can look at the claim notes; in particular Page 5 at the bottom, Mr. Vanti reflects on 12:07 p.m., on February 3rd the information I just read.

A    Yes.  On that date at 12:07, the adjustor was able to track down Mr. Manning.  And he said he was severely injured, and he said his passenger was severely injured.  And they refused to give a statement to the

adjustor, and said to speak with his carrier.

Q    And then the next entry references an RBI exposure opened.  What does that mean?

A    That's a residual bodily injury exposure; meaning they recognized that he made an allegation that he was severely injured, so they opened a feature to explain that.

Q    What's the term "residual" meant to imply?

A    I don't really know.  It's just a word that we use to open an injury feature, and --

Q    When you say injury feature, you mean you open up a part of the claim file to indicate that there is a potential bodily injury claim.

A    Correct.

Q    "Transferred to large loss."

What is does that mean?

A    That means that the specific injury handling was transferred to the large loss group.

Q    Does Mr. Jarvis have a relationship with the large loss group?

A    Yes.  He's a supervisor within that group.

Q    Who is Jessica Nelson?

A    Jessica Nelson works in our claims loss assignment group.

Q    And what does that group do?

A    They assign the claim.

So the claim was in -- was opened, and then it was transferred to large loss.  So she would just physically go in and transfer the case.

It's an admin function.

Q    Okay.  So she wasn't performing any adjusting features, she was doing the admin part of things.

A    Correct.

Q    Bottom of Page 6 there's a reference by Mr. Jarvis to -- "reviewed newly-assigned claim to Sabrina."  Who is Sabrina, please.

A    Sabrina is an adjustor within my organization at the time.

Q    As opposed to when?

A    Well, she's no longer employed with the company.  So at the time this was assigned, she was within that group.

Q    When did she leave Progressive?

A    I don't recall exactly when.

It was a few years ago.

Q    Why did she leave Progressive?

A    I believe in her case she was able to secure employment with a utility company, I think.  And she indicated it was similar paying, closer to her home so she didn't have to commute.

NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019                                    Page 63

Q    Where was she commuting from?

A    I assume her home to the West Palm Beach office.

Q    That's frequently how commuting works.

A    Correct.  I don't specifically know where she lived, but I do recall when she left being told that she got a job with a utility company outside the industry, and it was a better commute; similar money.

Q    Had you directly or indirectly reviewed -- Sabrina's last name, again?

MR. KISSANE:  Bertolini.

MR. MARINO:  Bertolini.

BY MR. MARINO:

Q    Had you directly or indirectly reviewed Miss Bertolini in the prior year or two?

A    Again, I think I answered that.

Once a year I sit down with all of my leaders -- there's five managers, 23 adjustors -- and we go through discussions -- a brief discussion with each adjustor, and we talk through their merit increase.

So I would have indirectly or directly talked through Evan and his supervisor about her performance, to approve her merit increase.

Q    And I appreciate that you're answering some questions that you know you may have referenced earlier.

I have to create a record, and I don't know that Miss Bertolini was in that department for enough time for you to have reviewed her.

So you gave me a general answer before; I just sometimes need to ask specific questions to make sure the individuals we're talking about here fell within that group.

A     I understand.

Q     I don't mean to make you say things all over again; there's a reason why I ask.

A     Okay.

Q     How long has Evan Jarvis been with Progressive?

A     I don't know.

Q     What is "triaged"?

He makes a reference to, "Claim triaged, due to report of two times serious injuries."

What does that mean?

A     I think the word "triage" is that synonym for transferred. A claim was triaged, or transferred.

Q     Is there a reference to triage in the claims standards?

A     There may be. I don't recall it word for word. I haven't looked at that document in quite a long time.

Q    Mr. Jarvis asks Sabrina to send an excess letter.  What's an excess letter, please.

A    Do you have a reference that you want me to look at.

Q    Continuing in the same notes, sir.

A    Okay.  On the same note?

Okay.  An excess letter is putting the insured on notice that there's the potential for the case to be valued outside their policy limits, or above their policy limits.

Generally whenever the claim comes in my organization, a letter goes out.

Q    When you say "organization", you mean your group?

A    Correct.  Because it's transferred into my group when there's an allegation that there's a serious injury.

Q    You said organization; I didn't know if you meant Progressive as a whole --

A    My group.

Q    -- your group.  All right.

And by the 3rd of February you had the police report.

A    Correct.  There's an entry saying that the police report was reviewed at 3:30 p.m.

Q    And you had information that your insured was speeding, doing at least 65 in a 45-mile per hour zone?

MR. KISSANE:  Object to form. Mischaracterizes the evidence.

You can answer if you can, sir.

THE WITNESS:  Yeah, I don't think there was any specific evidence of it.  There was an allegation --

MR. MARINO:  You need to stop doing that, please.

MR. KISSANE:  Doing what?

MR. MARINO:  That's the second time you've made a speaking objection that he then parroted.

THE WITNESS:  That's not true.

MR. MARINO:  Don't say it mischaracterizes the evidence -- which is a speaking objection -- and then the gentleman says yeah, there's no evidence to the effect.  So that's --

MR. KISSANE:  Well -- hang on --

MR. MARINO:  You fussed at me about that, so let's try to --

MR. KISSANE:  Okay.  Let me know when you're done.

If you ask a question that mischaracterizes evidence that you either do know or should know, I

am going to correct it on the record.

And we can just agree to disagree.

MR. MARINO: Okay. Then we can ask the judge to intervene on that --

MR. KISSANE: Well, I don't want to --

MR. MARINO: -- because you lectured to me about it last time about how I can't do the speaking objections that indicates stuff like that.

So let's just please keep it fair.

MR. KISSANE: Okay.

BY MR. MARINO:

Q You agree with me, sir, the next claim note down, IV contributed to acts for a speeding 65 mile per hour in a 45 mile per hour zone.

That's what somebody at Progressive wrote into your record. Correct?

A Yes. The property damage adjustor put Claimant vehicle's proximate cause for making left and causing collision. IV contributed to acts for speeding 65 in a 45, yes.

So Mr. Vanti did type that into the note.

Q Now, Miss Bertaloni first gets involved in the claim on February 6th? Do I have that correct, sir?

A Yes, that is correct.

Q And the first thing she does is set up

reserves for Norman and Janet Manning each of $10,000.

Am I reading that correct?

A    Correct.

Q    Now, I want to ask you about this next note. It's 9:41 a.m.  So it's 15 minutes after her first note, and the last segment of it says, "Adjustor sending --" I think that's "police report" -- "over to my attention. Advised police report lists insured --" blah blah blah.

If the information is available to the B I and PD adjustors equally, why is an adjustor sending the police report over to Miss Bertaloni if it's already in Progressive's possession?

A    Because Miss Bertaloni would be the individual that is on the claim that would make the liability assessment.  She's the higher-trained individual, and she would be then reassessing -- or assessing, initially -- her impression of the case.

Q    Right.  Now --

A    So she would do it independent of Mr. Vanti, and Mr. Vanti would yield to her to make the decision on the liability.

Q    All right.  I was asking more document specific question.

If Mr. Vanti already had the police report on the 3rd, I was asking to whom is she referencing when

she says adjustor sending police report over to my attention, if it's already in Progressive's file?

A    Again, this claim happened three years ago, so -- speculating, he had the physical police report.

It wasn't uploaded at the time, so she requested that the physical report be sent to her, because he did an initial cursory review of the officer's write up.

Q    Who is Patti?  If you look at the bottom of Page 9, Progressive 61, there's a note by Miss Bertaloni to Patti -- P-A-T-T-I -- regarding --

A    Patti would be an admin person within the group.

Q    Okay.  And she asked to send excess B/C.

Do you know what B/C stands for?

A    I'm not sure.

Q    Do you know if it's Boston Old Colony?

A    I don't believe that's it.  Please send excess B/C to named insured regular -- regular and certified.

I'm just not sure what that stands for in that sense.

Q    And I'm going to show you what's marked previously as Exhibit 4.  It's Progressive 050651 -- I don't know if these all --

A    I think I can form an opinion of what it was

now that I read through it, because I see the next page.

I think she's referring to some form letters that we use that ask them to let us know if they have other coverage; like Form B and C.

I was trying to think -- for me, B C is because, but I think she was referring to form.

Like send the excess letter and form B and C to the named insured, and the unlisted driver, meaning a request to see if they have other coverage.

Q     I gave your counsel a copy of what was previously marked Exhibit 4, February 6, 2017 letter. Do you know if that's --

MR. MARINO:  He needs to see that.

MR. KISSANE:  Oh, you do?

MR. MARINO:  No; he does.

MR. KISSANE:  Oh, I'm sorry.

I thought that was my copy.

BY MR. MARINO:

Q     Do you know if this is the letter -- the excess letter that's being referenced in the claim notes?

A     It appears to be; yes.

Q     In the bottom in very small print, it says --

A     Yes.  References a form number, 2509 X X.

Q     2509 X X?

A   2509 X X.

Q   And parens 01/14, and then hyphen -- FL for Florida?

A   I do see that.

Q   So this would be a -- this would be, in that Word processing universe, available to an adjustor, one of the forms they can implement with regard to claims handling.

A   Correct.

Q   And it lists all the different coverage amounts available under the policy, including PIP, roadside assistance, rental reimbursement.

You see that?

A   I do.

Q   And then it says, "If the value of the damages exceeds the coverage amounts, you'll be response for paying the difference."

Do you know which coverage amounts or which coverages are being referenced in this letter?

A   I would assume that being referenced would be the bodily injury, and possibly the property damage.

Q   How does the insured know that?

You're an experienced adjustor for 34 years. How does the insured know which of these are being referenced in the face of the letter?

MR. KISSANE:  Object to form.

THE WITNESS:  Because the physical damage doesn't have a coverage cap, nor does the rental at 40 a day.  So this is just putting them on notice that there's the potential that the injury or the property damage or a combination or both may be in excess of the policy limits.

Generally adjustors also call the insured when the claim comes in and explain it verbally, in addition to the letter.

BY MR. MARINO:

Q    Is there a more detailed version of this letter available to a Progressive adjustor?

A    Not that I'm aware of in this state.

Q    Is there a version of this letter where there are blanks that can be filled in or data that can be added to be more claim specific available to a Progressive adjustor?

A    Not that I'm aware of.

Q    Do you know which of the claims -- strike that.

Do you know why Mr. Vanti and not Miss Bertaloni conducted a recorded interview of your insured driver on February 6th, 2017?

A    What date?  I've got the February 26, but what

time.

Q    No, sir.  February 6.

A    Oh.  February 6.  11:12 --

Q    11:13 a.m.

A    Where it says participate in the statement
with Max Moore?  Is that the --

Q    Okay; I'm confused, then.

So you have an 11:12 entry by
Miss Bertaloni --

A    Correct.

Q    And an 11:13 a.m. entry the same day by
Mr. Vanti.

Are they both referencing their take on the
same statement, or are they referencing two different
interviews?

A    I think it was the same interview.

Miss Bertaloni indicated she participated in
the statement, then she documented the context of her
discussion.

I think Mr. Vanti then either was involved in
that, or reviewed her notes, or reviewed the statement,
because it's recorded, and then typed some additional
notes.

Q    By February 8th Progressive was aware that the
Mannings were represented by counsel.  Correct?

MR. KISSANE:  Object to form.

THE WITNESS:  Are you -- okay.

Let me go to the 8th.

BY MR. MARINO:

Q    I'm not necessarily following each entry in here; I'm asking in a general sense, based on the written communication of the claims notes.

A    Yeah.  If you reference a note, I can look at it and confirm.  This -- document is 120 pages, and I don't have the specific claim memorized.

Q    Sure.  Do you know whether by February 8th Progressive knew that the Mannings were represented by counsel?

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q    Here.  Let me show you a document Bates labeled Progressive 886?

A    I do see an entry --

MR. KISSANE:  Hang on a second.

If you wanted to explain something, go ahead, sir.

THE WITNESS:  I was just going to say, I do see an entry on February 9th at 1:58 where they added Attorneys Vassallo Lilotta --

MR. MARINO:  Just say Lilotta --

THE WITNESS:  -- to the claim.  So on the 9th they did have notice, because they added that individual to the claim.

MR. KISSANE:  Do you want him to look at this?

MR. MARINO:  Sure.

MR. KISSANE:  Are we marking it?

MR. MARINO:  I think it was marked before.  I don't want to remark it.  It's Bates labeled --

MR. KISSANE:  Do you know what it was marked as?

MR. MARINO:  I don't; otherwise I'd reference it.  But it's Bates numbered, so when know what the document is.

BY MR. MARINO:

Q    Now, there's a fax line at the very top of the page that references February 8, 2017 at 5:25 p.m.

Do you see that?

A    I do.

Q    And there's a "Received" stamp, dated February 9, '017.

Do you know whose that stamp would be?

A    I don't know specifically.

It was stamped by Progressive as being received.

Q    Looks like Mercedes something -- it's faded --

A     Yeah; I can't really tell.

Q     And below that it's stamped "Reviewed" on February 10 by -- and it gives a code number there.

A     I do see that.

Q     Do you know who that is?

A     I couldn't tell you offhand what that -- what employee that code number goes to.

Q     And then you have received February 13, 2017, Patricia Sellers, and there's a different code number, West Palm Beach, claims admin.

Do you know who Miss Sellers is?

A     Yes.  Yes, I do.  She's an admin in West Palm.

So for that specific stamp, it came into the West Palm office, and she stamped it as being received in the mail process.

Q     And then you have Evan Jarvis, February 13, 2017, Claims Superintendent, reviewed.

That's a separate stamp; right?

A     Correct.  The first one would have been received by the clerical or admin person in that office, the second one would have been where it was given to Mr. Jarvis, who looked at it.

Q     So just 'cause it came in on the 8th doesn't mean that everyone necessarily saw it on that same day.

Fair?

A     Yes.  It doesn't indicate where it came in.

If it came in to another claims off, say Tampa, it would have been forwarded.

Q     There's a fax number.

A     That fax number's on the letter from the law firm, but that doesn't necessarily mean it was faxed from there.

It's very common that we get rep letters and documentation with fax numbers in that are faxed to other offices.  And there's also dates -- it's very common for the date not to reflect the date it actually got received by Progressive.

Q     Do you know where Mr. Vanti was based?

A     No, I don't.

Q     Is there a Miami office that Progressive maintains?

A     Yes.  We have currently a couple of offices in Miami, but yes, we have Miami offices.

Q     Do you know -- here.  Let me show you what was previously marked as Defendant's Exhibit 1.  And this --

MR. MARINO:  You may have marked that for Joe Bolota's (phonetic spelling) depo.

MR. KISSANE:  Okay.  Here you go, sir.

BY MR. MARINO:

Q     And again, it has the same fax number,

(305) 889-5806.

Do you know if that was the fax number where Mr. Vanti was?

A     I have no idea.

Q     You see on the heading?

A     I do see it on the heading, but I would have no idea what that specific number goes to.

Progressive has offices in every major city. I have employees in 10 offices. I could not tell you what the fax number is for any specific fax.

Q     Do you have any reason to believe that this fax number is wrong?

A     No.  Nothing in particular.

Q     And then there's a reference -- and this may be the scanning system you talked about.  There's a reference down here in the lower left, received date, 2-10-2017.  Do you see that?

A     I do see that.

Q     Would that be indicative of the scanning system that you talked about earlier?

A     I have no idea.  Obviously somebody stamped it or typed in there "received" that day, but I couldn't tell you where or how that was generated, or when.

I assume it was 2-10.

Q     In this letter Mr. Bolota's advising you that

Mrs. Manning is on life support in ICU at Bethesda Hospital in Boynton Beach; correct?

MR. KISSANE: Object to form.

THE WITNESS: Yes. It does say Janet Manning's injuries are non-incapacitating, and she's been on life support in ICU.

But I don't see anything specifically attached to it, so it wasn't a demand.

There's no medical bills, no other details or narratives. No medical records.

MR. MARINO: Move to strike as non-responsive. I understand you have a narrative, but I asked you a question about the one specific thing.

MR. KISSANE: That's not proper.

MR. MARINO: It is proper.

MR. KISSANE: No, it's not.

THE WITNESS: I'm sorry; I just --

MR. KISSANE: You can just -- you can just say you move to strike it. I don't know why you would move to strike it. No one cares.

MR. MARINO: Well, the witness might care, so he knows what the my objection was.

BY MR. MARINO:

Q    Now, was there a time between February 8th and March 6th where Mr. Bolota's (phonetic spelling) office

did not return phone calls to Progressive?

MR. KISSANE: Object to form.

THE WITNESS: I don't know. I'd have to -- if you have a specific note I can look at. As I stated, this is -- this accident happened three years ago, and it's 120 pages. I don't have this specific case memorized. I'll be more than willing to look at a specific date and time, if you'd like me to read the face sheet notes from the adjustor.

BY MR. MARINO:

Q    My question was, are you aware of there being some issue -- or not -- that during the several weeks that followed the introductory letter to March 6th, that there was an issue with Progressive being able to communicate by telephone with Mr. Bolota, or his office?

A    I don't know, unless you'd like me to read all those pages.

Q    You reviewed materials in preparation for being deposed today, and you reviewed the correspondence. And you're my Progressive witness, so I'm going to ask you the question. If you're unable to answer, you can tell me that.

MR. KISSANE: Wait, wait. Hang on --

MR. MARINO: That's my question.

MR. KISSANE: These questions -- all of these

questions, Steve, are outside the scope of your
notice.

You only noticed him as to two things:
Settlement offers made, settlement demands made,
and the investigation of the claim by Progressive.

MR. MARINO:  Well, he testified earlier that
there are nine topics --

MR. KISSANE:  Yeah.  There are nine topics,
none of them covered by what you're asking him; and
that's what I'm telling you.  If you want to point
to one -- this has nothing to do with the
investigation by Progressive, or settlement offers
or demand.  You're walking him through claims --

MR. MARINO:  "Any and all correspondence or
other communications between Progressive and the
Mannings, or the Mannings' agent or
representatives."

BY MR. MARINO:

Q    Now -- since we've gotten past the speaking
objections --

MR. KISSANE:  That's not a speaking
objection --

BY MR. MARINO:

Q    -- my question is, are you aware of any?

A    I couldn't answer --

NORMAN D. MANNING, ET AL. vs PROGRESSIVE AMERICAN INSURANCE COMPANY
Doug Helton on 12/16/2019

Page 82

MR. KISSANE: Wait, wait, wait, wait.

Objection. Asked and answered. Twice.

Go ahead, sir.

THE WITNESS: I'm not aware of any, unless I were to specifically read each face sheet note.

BY MR. MARINO:

Q In your review of the correspondence and the claim notes in preparation for today, did it stand out to you that there was -- during that time period -- some concern raised that you couldn't reach him by phone?

A I don't recall. I read this claim a week ago, but as I said, it's 118 pages. I didn't memorize anything specific. I looked through the claim and I went on with my day. Lot of things I have to do.

So I didn't memorialize in my mind everything that happened in the 118 pages of this, so I don't recall.

Q You're not saying this claim was important?

MR. KISSANE: Object to form.

THE WITNESS: I didn't -- I didn't say that at all, actually. I said I have a number of responsibilities in my day.

In preparation for this I did look through the claim. I looked through the redacted face sheet notes, but I think it's unfair to think that

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

somehow I memorized everything that happened three years ago in this claim.

MR. KISSANE:  Steve, I want to renew my objection.  This line of questioning is outside of the scope of Schedule A.

BY MR. MARINO:

Q    You may have answered this:  Who's Shorna Bailey?

A    I don't know Shorna Bailey.  I don't know who she is.

Q    Who's Johana -- J-O-H-A-N-A, Aleman -- A-L-E-M-A-N?

A    Do you want me to look at a specific note?

I don't know the name off the top of my head --

Q    Okay.  That was my question; do you know who that person is.

I guess I'm looking at Page 20 of the claim notes.  It's Bates numbered Progressive 72.

MR. KISSANE:  Do you have a time, Steve?

MR. MARINO:  It's the very top of the page.

THE WITNESS:  Okay.  I do see that.  I don't know who that individual is.

BY MR. MARINO:

Q    It's listed as a file intervention.

What is a file intervention?

A    When you add a claim note, there's a whole drop-down list of different things that you could pick.

For instance, payment, contact.  So in this case they selected file intervention.

It simply means somebody looked at the file.

Q    In the third segment of what Miss Aleman enters, says, "Needs to follow 14 steps to CNC  WIT.

What does that mean?

A    Okay.  This is -- proximate cause for loss -- 14 steps -- I think -- as I articulated earlier -- I'm not the one that added this, so I'm going to speculate it's the list of steps they go to contact somebody.  Do the research, try them at home, try their cell, try to text them, try to go to their home if need be --

BY MR. MARINO:

Q    So CNC is contact.

A    My interpretation of that would be contact, but I didn't write the note.

Q    Right.  And WIT would be witness?

A    That would be my assumption; yes.

Q    So the same thing, next note, "Need to contact CC."  That would be the claimants?

A    Claimant carrier, so that would be the Mannings' insurance carrier.

Q    "Request pictures for claimant's vehicle, CD statement to CC."

A    Right.  Try to get the Claimant driver's statement.

Q    And then the next entry is a February 9, 2017 recorded interview by Mr. Vanti with a witness, Abby -- A-B-B-Y, Elder -- E-L-D-E-R?

A    Correct.

Q    I may be missing it.
Did Miss Bertaloni participate in that interview?

A    I don't know.

Q    The next entry is an inbound call from claimant's carrier?

A    I see that.  2-9-17 at 1:55.

Q    Okay.  And then claimant's carrier provided Claimant driver's statement.
Is that what that stands for?

A    Correct.  So that would be the.

Q    Mr. Manning.

A    Mr. Manning's adjustor relaying to what they told him; that he made a left turn in front of an oncoming car.

Q    Okay.  If you go to the next page on Page 21, the very bottom entry, 2-10-17, inbound voicemail

Victoria Lane -- who I believe was identified as the claimant's carrier rep -- advised, "does see Sub Comp Neg; has statement re F O L."

Q    What does "F O L" stand for?

A    Facts of loss.

Q    "From claimants she can share."

Would that be a reference to a statement from Mr. Manning?

A    Says she does see some comparative negligence as statement -- from claimants she can share.  So it's one or both; it says claimants.  I can make an assumption it's the Claimant driver, since -- I think that's what is referenced in the prior note.

Q    Yeah.  It says Mrs. Manning is still in ICU, so she's probably not talking.

MR. KISSANE:  Object to form.

MR. MARINO:  True.  Move to strike my own -- withdraw my comment.

BY MR. MARINO:

Q    If Mr. Vanti had the information on February 9th in the notes, wouldn't it be a document that Miss Bertaloni can also get to, in the claims system?

MR. KISSANE:  Object to form.

THE WITNESS:  Yeah, I don't believe this was a

document; I think this was a conversation, is my interpretation. Like, I don't think they gave a written statement.

I think this was relayed verbally from the other carrier, saying that he saw the insured vehicle approaching, thought he had time, so he made the left turn directly in front of the oncoming vehicle.

BY MR. MARINO:

Q So as of February 10, 2017, if I'm relying in part on the next page -- as of February 10, 2017, Progressive is aware that the police report and an independent witness and the claimants are all saying that the insured driver was speeding, and that it contributed to the accident, and the police report says the same thing. Correct?

MR. KISSANE: Object to form.

THE WITNESS: No, I don't agree with that.

BY MR. MARINO:

Q Okay. You don't have personal knowledge of what happened in the claim; you're relying on the claim notes. Fair?

MR. KISSANE: Object to form.

THE WITNESS: Yes, but I did look at the police report, and I did read these claim notes.

BY MR. MARINO:

Q And if I misinterpret the claim notes, they say what they say, and my misinterpretation is incorrect. Fair?

A Correct.

Q I don't want to fight with you over the specific words. You and I are both reading the claim notes. If I misinterpret them, that's my fault. That doesn't make my misinterpretation a fact. Fair?

A Yes. There were some allegations that he was going faster than he probably should have.

Q And the adjustor for the Mannings' insurance company was saying that she sees comparative negligence because of the speed issue.

MR. KISSANE: Object to form.

THE WITNESS: Yes. From review of the file, the adjustor for Allstate felt that Mr. Mohr could be up to -- I think 20 percent at fault, with her driver being 80 percent at fault.

BY MR. MARINO:

Q Well, I think the next note indicates it's 75/80 and 20/25.

A I'm sorry; what?

Q The next note, on that same page.

A Which page?

Q    22, still.

A    Oh, 22?  I was on 21.  Sorry.

Q    Miss Bertaloni.  Second to last.

A    They're considering 75 to 80 against their driver, and 20 to 25 percent against our insured for possible speed.

Q    At some point in this time period, both Miss Bertaloni and Mr. Vanti agreed to a portion of 80/20 as between Mr. Manning and the insured driver.

Is that you're understanding from the notes?

A    What time frame?  I mean, up through the 13th, I don't think that's accurate.

If you could point me to a face sheet note -- I think up through the 13 -- I know that she had contacted the driver, and he said he didn't know the speed limit, or how fast he was going.

The witness said the Claimant was at fault for turning left in front of them, but she thought maybe he was going faster than he should have been, but she didn't know how fast.

And the police report simply echoes what the witness' personal opinion was; that it looked like he was going a little faster than he should have been.

Q    And the speedometer was stuck at 67.

MR. KISSANE:  Objection.  Form.

THE WITNESS:  Yes.  I did see that, but -- I mean, that's certainly documented there, but -- I mean, I -- I personally would have no idea how that occurred, whether or not it had been stuck at 67 for an extended period of time.  You know, if there was a malfunction, if in the impact it damaged electrical wiring or the computer so it was set at that, and -- I remembered reading the claim; like the black box download proved that that was inaccurate; it was actually I think going 54 at impact?

BY MR. MARINO:

Q    It was going 90, and then he braked, and at the time of impact it was 54.

MR. KISSANE:  Move to strike that comment.  You're wrong.  What he just said is absolutely accurate.

MR. MARINO:  Okay.  Thanks for the speaking objection --

MR. KISSANE:  That's not a speaking objection --

MR. MARINO:  It is.

MR. KISSANE:  He already answered the question.

You're still telling him for any further

questions what you think the information is.

MR. MARINO: No, but you --

MR. KISSANE: Steve, you said it --

MR. MARINO: Joe, please stop.

MR. KISSANE: No, no. You said --

MR. MARINO: Joe, please stop.

MR. KISSANE: Listen. Let me --

MR. MARINO: There's no reason to have a narrative in front of the client -- in front of the witness. Please stop. I'm moving on.

MR. KISSANE: Okay. But you can't interrupt me, and I'm not doing a speaking objection. It's just that you, again, said something that wasn't accurate. That's all.

THE WITNESS: Again, just to clarify, I think the speedometer broke it at 67. Specifically what I was saying was inaccurate, because the black box was 54.

MR. MARINO: Right. See, so you say something, then he comes back --

MR. KISSANE: No --

MR. MARINO: -- and amends his answer --

MR. KISSANE: No, he said it before I did.

MR. MARINO: -- that's why you know it's wrong.

MR. KISSANE:  No, no.  He said 54 before I did.  I never said 54; I just said what he said was accurate when you corrected him.

But I agree with you, let's just move on.

MR. MARINO:  Give me a minute, please.

BY MR. MARINO:

Q    Can you turn to Page 48 of the claims notes, which is Progressive 1293.

A    Okay.  I'm on Page 48.

Q    And who is Brenda Sheffield?

S-H-E-F-F-I-E-L-D.

A    Brenda was another adjustor that worked in my organization, being the large loss organization.

Q    Do you see where there's a paragraph that starts "preliminary."  Do you see that?

A    Yes.

Q    Under expert Ken Bynum, B-Y-N-U-M?

A    Yes.

Q    Now, tell me if I'm reading this correctly.

"Insured vehicle was traveling 90 miles per hour three seconds to our accident.  Period.  It appears that when our insured realized the CV was in his path he immediately began to decelerate, and at the point of impact the black box records that Mr. Mohr's vehicle was traveling at approximately 54 miles per hour.  Period."

Did I read that correctly?

A    Yes.

Q    Going back to the timeframe we had been discussing earlier -- which is middle of February of 2017 -- Mr. Vanti and Miss Bertaloni are speaking to adjustors from Allstate, who are the Mannings' insurance company adjustors.  Correct?

A    Correct.

Q    All right.  And as of the 14th of February, the information that Progressive has from the adjustor, Victoria, is that, "Miss Manning took a turn for the worse last week, and was not expected to survive.  Not sure if any change to condition since last week."

That's what the claim notes says; correct?

A    Okay.  Do you have a page number you want me to look at?

Q    Page 24, sir.

A    Oh, Page 24.  I was on Page --

MR. KISSANE:  You have a time, Steve?

MR. MARINO:  Sure.  2-14-17, 10:50 a.m.

THE WITNESS:  Received call from CC adjustor -- yes.  I do see where it says that.

BY MR. MARINO:

Q    Then below that it says verified FOL.

Is that verified facts of loss?

A      Yes.

Q      CD is Claimant Driver; Mr. Manning?

A      Correct.

Q      "Observed insured vehicle --" which is Mr. Mohr -- M-O-H-R, by the way -- "but thought he had enough time to turn left. As making the turn, insured vehicle struck claimant's vehicle. Felt insured driver traveling way too fast." Did I read that correctly?

A      Yeah. I think that's what the Allstate adjustor is relaying to her, as to what I assume Mr. Manning told Allstate adjustor.

Q      Was there eventually an intercompany arbitration or ADR process to determine the contribution subrogation amounts between the carriers?

A      I believe there was.

I remember seeing something about that in the claim.

Q      Do you have any independent knowledge of what occurred during that process?

A      No.

Q      Do you have any independent knowledge of what the result was, other than what's written in the notes?

A      No. Other than what's in the notes.

Q      Okay. So what's in the notes is the information we have. Fair?

A    Yes.   That's all I would have.

Q    And on February 14th, 2017, Mr. Vanti determined liability range with regard to the accident; correct?

MR. KISSANE:   Do you have a time?

BY MR. MARINO:

Q    Do you know whether my statement is accurate or not, sir?

A    I'm sorry; is it Page 24, 25 or 22?

I think the notes overlap.

Q    Right.   And it's not my intention to walk note by note and just say doesn't the note say this?   Because if the only information you have is what's in the note, then you and I can just rest on the notes and make our arguments.

If you have independent information, then I can ask you above and beyond the notes.

But if the information that you have on the file is what you're reading here, I don't think it's necessary for me to ask you to verify that I read it correctly.

So do you have independent information beyond what's here in the notes?

A    No.   I wasn't involved in the handling of the claim.

Q    Could Progressive had tendered the policy's limits of 10,000 per person, 20,000 per accident, to the Mannings on February 9th of 2017?

MR. KISSANE:  Object to form.

THE WITNESS:  I mean, from a technical basis, they could issue a check any time they wanted. They could have done February 1st, the very second it came in.  But they have to complete a number of steps before they ultimately make a decision of whether or not to pay the claim.

BY MR. MARINO:

Q    And those steps to your knowledge are what?

A    In this case?

Q    No.  In general.

A    Okay.  Well, they would secure the police report to see what it had to say.  They would contact the insured to try to take a statement -- meaning the driver.  They would have to contact the named insured to take a statement, since the driver's not on our policy. They probably do a scene investigation, they would probably try to track down and contact a witness and take a witness statement.

They would contact the Claimant carrier to see what information they would have.  They would contact the driver's carrier to see what information they would

have, to see if there's any other coverage.

They'd have to make a coverage determination. They would have to try to look at both vehicles involved in the claim. They would have to respond to any correspondence that would come in from the attorney, and then they would ultimately try to secure medical bills, review any demands that come in, any medical records, and then ultimately make a decision.

So I think -- you know, just counting in my head, that's probably 18 steps they had to go through.

BY MR. MARINO:

Q   And how long does that take?

MR. KISSANE:  Object to form.

THE WITNESS:  It varies.  Like, in this specific case -- I mean, they were tasked with a number of challenges right off, in that Mr. Manning refused to give a statement.  Our insured, when we called them, said they had a lawyer and they don't speak English, so they had to go through that lawyer.

They had to track down a witness.

These things all take time.

You know, as far as securing medical records, medical bills, they weren't able to do that.  None were ever presented in the case.

But they did have to contact a number of different carriers -- there was a lot of work that had to be done, and I felt that they really worked diligently non-stop to try to get all that information.

BY MR. MARINO:

Q     When in your timeline of the case did anyone at Progressive ask for medical records for Janet Manning?

A     I didn't see any specific note documenting it, but generally when the adjustor talks to an attorney, they always ask for the medical records.

I mean, that's a pertinent part.

In my experience, in most cases the attorney provides the medical records to them.

You know, in this case, none were presented.

Q     When --

MR. KISSANE:  Wait a second.  Were you finished with your answer.

THE WITNESS:  Yeah, I'm finished.

BY MR. MARINO:

Q     When in the timeline of the case was there any claim note entered referencing -- asking for -- whether it's from Allstate or Mr. Belota -- asking for medical records as to either Norman or Janet Manning?

A    I didn't see any specific note in there, but these are just basic documentations that are abbreviated that the notes don't have a word-for-word transcript of everything that went on and every discussion that went on.

It's just a basic review, using abbreviations, of some basic information. Like, here's one, inbound call from Liz, with attorney. I mean, it doesn't detail everything that went in on that conversation. And any detail of affect of that one, it just says there's no other detail.

Q    When in the claim file was there a letter written to either Allstate or Mr. Bolota, asking for medical records on Norman or Janet Manning?

MR. KISSANE:  Objection. Asked and answered --

THE WITNESS:  Yeah, I don't recall seeing one in there -- I'm sorry.

MR. KISSANE:  Go ahead.

THE WITNESS:  I don't recall seeing one.

BY MR. MARINO:

Q    Isn't it common for -- in severe injury cases -- for one insurance carrier to take the information from another carrier and accept it?

MR. KISSANE:  Object to form.

THE WITNESS:  No.  It's not common.

BY MR. MARINO:

Q    Is that what was done here?

A    What was done here?

Q    With regard to Janet Manning, was the information received from Allstate accepted at face value?

A    No, I don't believe so.

I mean, it's anecdotal data that comes from a third party; not directly from an attorney, and there was no bills or no attachments.

I mean, they factor it in, but -- you know, the fact of the matter is, the Claimant carrier adjustor is there to defend their insured, and I don't think they had exact information to pass on, such as medical bills, details of the exact injuries, the total medical bills, medical records.

Certainly the adjustor documented what they said.

BY MR. MARINO:

Q    Well, we're talking about a 10/20 policy.

So Miss Manning, by the middle of February, is still in ICU, and the information Progressive is receiving is she's not going to make it.

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q   So how much more information does Progressive need to say we should probably tender the policy limits?

MR. KISSANE:  Wait, let me object to form. That's not a question.  Go ahead.

THE WITNESS:  It's anecdotal information from a third party.  They certainly factor it in, but the factor in this case was the liability issue.

So the injury information was put into the file, but I think at that point the adjustor was focusing on finishing the liability decision, because it appeared that Mr. Manning, in fact, turned left in front of an oncoming car, causing this accident, and I think the police report said that, the witness said that, our insured said that, our insured's attorney said that.

And I believe, the Claimant carrier adjustor also agreed with that; that he turned left in front of him.

So I think the adjustor is going through those investigative steps, as well as clearing coverage before they got to the final step of whether or not, you know, they should tender.

You know, in this case there wasn't any demand that came in that I saw when I read it with any

medical bills or records, so at some point within they made that decision, even though there really wasn't any opportunity to settle the case until the point that the adjustor decided to proactively tender, with no demand and no records.

BY MR. MARINO:

Q    There was no opportunity, sir?

What prevented -- you just said technically they can send a check at any time.

What prevented them from sending the check on February 12th?

MR. KISSANE:  Wait, wait.  Object to form. Mischaracterizes his testimony.  You can answer.

THE WITNESS:  Yeah, I think you misinterpret. When I said opportunity --

MR. MARINO:  Third time.  Actually, fourth time.

MR. KISSANE:  Go ahead.  You can answer.

THE WITNESS:  You interrupted me, so I couldn't finish my answer.

MR. KISSANE:  Well, hang on a second --

MR. MARINO:  No, no.  Actually, you answered. I asked a question, he objected, and then you started answering, tagging off of his objection that I'm mischaracterizing what you said --

THE WITNESS:  You are.

MR. MARINO:  -- and that is -- but that's a refrain that we keep having --

MR. KISSANE:  No, it's not --

MR. MARINO:  -- is that he -- instead of saying "object to form" and leaving it at that -- which is what you're supposed to do -- as you advised me, Mr. Kissane, on a number of occasions --

MR. KISSANE:  I don't want to argue with you; just ask him a question.

MR. MARINO:  Okay.  I did.

THE WITNESS:  So what --

MR. MARINO:  What prevented -- let me ask the question again, so we have it clean.

BY MR. MARINO:

Q    What prevented -- if anything -- Progressive from sending a check to Mr. Bolota's office on February 12th of 2017?

A    The adjustor was still completing her investigation -- can I respond to your other question?

I think you misinterpreted the word "opportunity" that I used.

The word "opportunity" in that sense is a demand being received, which gives our insured a release

of all claims and demands, in exchange for tendering.

That opportunity never occurred.

They never received a demand with any records, any medical bills, anything for them to consider. That's what I meant by opportunity.

Certainly an adjustor can issue a check; they do it all day long.

But in this case they were still completing their investigation, because the primary focus was the fact that Mr. Manning caused this accident, not Mr. Mohr.

Q    And as of February 14th, Progressive's file shows that the determination was made that it accepted 20 percent liability for Mr. Mohr.  Correct?

MR. KISSANE:  Object to form.

THE WITNESS:  I -- if you have a specific note you want me to look at, I'll look at it.

BY MR. MARINO:

Q    It starts on Page 26.

There's a whole bunch of references.

A    Okay.  Which specific one?  You just -- you want me to just read them?

Q    Are you unable to answer my question in terms of the way I asked it?

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q   Because I'm not inclined, sir, to go and point you to specific notes and say, "isn't that what it says."

I'm going to ask you questions. You have that body of documents to review. It will help you.

So, isn't it true that as of February 14th, Progressive had made a determination that Mr. Manning was 80 percent liable, and Mr. Mohr was 20 percent liable?

MR. KISSANE:  Object to form.

THE WITNESS:  I think -- on the 15th I do see a note from Terry Vanti, saying that -- I think he -- he thought it was 80 percent and 20 percent, but he's the property damage adjustor.

And if I go on to 27, I think he has -- that's it; Page 27, 215, he has that note. "Outbound call to named insured. Attorney advised liability 80 on unlisted driver; 20 percent on Claimant driver."

I do see that he entered that note.

I -- don't see it going through the 28th from the primary adjustor, which is Sabrina Bertaloni, which would be the proper adjustor to make the liability decision, not the property damage adjustor.

I could continue to read if you'd like.

So I guess my answer would be no, on the 14th, I don't agree that Sabrina had made a liability decision, unless I'm missing something.

BY MR. MARINO:

Q    Now, on the 16th of February 2017 Miss Bertaloni speaks with Mr. Bolata and his paralegal, Margaret.  Do you see that reference on Page 28?

A    Yes, I do --

Q    At 10:48?

A    -- 10:48 a.m.

Q    Do you see any reference to asking for medical records, as to either Janet or Norman Manning?

A    Not in this specific note.

Q    Do you know if in any of Mr. Bolata's written responses he indicates that he is not providing medical records, or he is refusing to provide medical records?

A    I think the one correspondence or two that you looked at -- that you sent me -- or gave me; I'm sorry -- it's -- doesn't address one way or the other, so I'd have to speculate.

As far as this face sheet note, I wasn't a party to that conversation, so I don't know if she asked at that point.

And again, these aren't transcripts of an

entire conversation; it's basic documentation.

Sabrina would be the one to know if she asked; not me three years later.

Q   Do you know if at any time prior to March 2, 2017, anyone at Progressive indicated to Mr. Bolata that they would be tendering some or all of the policy limits to the Mannings?

A   Again, if you want me to look at a specific date and time I could look at that.

Q   Are you unable to answer my question, sir, as phrased?

MR. KISSANE:  Object to form.

THE WITNESS:  Can you ask the question again?

BY MR. MARINO:

Q   Sure.  Do you know whether at any time prior to the March 2, 2017 letter, anyone at Progressive indicated to Mr. Bolata that there would be tendering limits as to Janet or Norman Manning, or both.

A   Again, I don't know what went on in the individual conversations.  I mean, I can only look at what was printed here.

Q   And you didn't -- you didn't confer with any of the adjustors involved in the case to prepare for today's deposition; correct?

A   No.  Unfortunately, neither of the adjustors

work for the company, so I didn't contact them directly
to discuss anything about the case.

Q    Do you know if your attorneys have?

MR. KISSANE:  Object to form.  Don't answer --
wait, no.  Do not answer that question.

Attorney/client privilege what his attorneys
have done.

MR. MARINO:  Well, he's saying --

MR. KISSANE:  If I told him what I did, that's
my work product.  That's objectionable.

MR. MARINO:  Well, he's saying that he did not
speak with them, and I'm asking in a yes-or-no
sense, does he know whether you guys spoke to those
witnesses.

MR. KISSANE:  Yeah.  And my objection's the
same; it would be my work product, and it's
privileged.

MR. MARINO:  Because the follow-up question is
are they not speaking to anybody, are they refusing
to communicate, or did he have the ability to
communicate, and he did not feel it necessary or
appropriate to communicate.

So that's what I'm getting at.

MR. KISSANE:  Yeah.  I mean, my objection
remains the same.

THE WITNESS:  Yeah, I --

MR. MARINO:  Wait.

THE WITNESS:  Sorry.

MR. MARINO:  So before he answers, are you instructing him not to answer?

MR. KISSANE:  Yes.  Those questions, I am. That would be my work product.  I mean, if you want to ask me, I don't mind telling you.

MR. MARINO:  Well, I'm asking him as a follow up.  But you're being instructed not to answer, so maybe -- you tell him no, 'cause he was getting ready to answer me after you spoke.

MR. KISSANE:  I've objected on the basis of my work product privilege, and I do instruct the witness not to answer.

MR. MARINO:  Okay.

BY MR. MARINO:

Q    Do you know if there's anything that prevented you from speaking to any of the adjustors that worked on this file?

A    No.

Q    Do you know whether in a general sense your attorneys represented those witnesses at their depositions?

MR. KISSANE:  Object to form.

Which witnesses, Steve?

MR. MARINO:  The adjustors, who were on the file.

MR. KISSANE:  Okay.  The reason I said that, they all haven't been deposed.

MR. MARINO:  Some of them have.

MR. KISSANE:  Some have; yes.

MR. MARINO:  Okay.  And my impression was that you acted as counsel at their depositions.

MR. KISSANE:  I wasn't at all of those depos, but my firm was.

MR. MARINO:  Exactly.

MR. KISSANE:  I can say that's -- what you just said is correct.

MR. MARINO:  Okay.

BY MR. MARINO:

Q    So there was nothing that prevented you from communicating with those witnesses; you just did not.

Fair?

A    Yeah.  They're not employees with the company, so I didn't call them.

Q    We talked a bunch about this proactive tender.

What was the basis for the proactive tender?

A    Again, do you want me to read a specific note?

Q    No, I want you to answer the question that I

asked if you're able to, sir.

A   Well, I would say the basis of the proactive tender after the adjustor finished their investigation was to secure release of our insured, because at that point they made the decision that it was the insured's best interest to try to seek a release, and to tender the $10,000 coverage proactively, without a demand.

Q   You don't need a demand to settle a claim; correct?

MR. KISSANE:   Object to form.

THE WITNESS:   No.  In general you don't need a demand, but -- you know, it's been my experience that when you're settling a claim, specifically a claim where you're not clearly liable for the case -- and in this case I don't think we were clearly liable -- that generally, the attorneys send a demand with supportive medical records, bills, documentation, and then the adjustor will weigh the insured's best interests against the demand, the injuries that are presented, the liability that's presented, and then seek a release for the insured.  That's typically how it works.

BY MR. MARINO:

Q   Okay.  And move to strike as to the general practice within the community.

My question was you don't need a demand to make a proactive -- that's the definition of proactive tender; you're doing it without a demand; right?

MR. KISSANE:  Object to form.

THE WITNESS:  Correct.

But again, you know, it's been my experience in the handling of a case that it's the attorney that provides that.

I mean, in a case such as this, where we're not at fault, my adjustor has a fiduciary responsibility to defend the insured; not to go out and seek these things as best as they can to prove the case against them.  They're doing the liability investigation in the case, and at some point they made the decision when they finished that to tender -- notwithstanding the fact there was no demand and no medical records -- to try to release the insured.

MR. MARINO:  Move to strike.

BY MR. MARINO:

Q    Definition of proactive tender is a tender in the absence of a demand.

That was your definition from before; correct?

A    Correct.

MR. KISSANE:  Object -- wait a second.

Objection.  Asked and answered.

BY MR. MARINO:

Q    And we agreed, I think -- but correct me if I'm wrong -- that there was nothing technically impeding a tender of the policy's limits prior to March 2nd, 2017?

MR. KISSANE:  Objection.  Asked and answered.

THE WITNESS:  The clerical function, certainly.  But the adjustor wasn't finished with the investigation.

BY MR. MARINO:

Q    Now, Miss Bertaloni, on the 28th of February of 2017 --

A    So you said February 28th?

Q    Yes, sir -- came to the same conclusion that Mr. Vanti had come to two weeks earlier.

Have you consulted with anyone -- well -- strike that.

Are you aware of anything in the file that she needed to make her determination that Mr. Vanti didn't have when he made his?

A    Yeah.  I think as I looked through the file that she was continuing to investigate the case, and wanted to get photographs of the vehicles so that she could look at impact points to make her final liability

decision.

Q    Was that your complete answer, sir?

I didn't want to interrupt you.

A    No, that was it.

Q    Now, when the tender was sent, Miss Bertaloni was the one who chose the proposed release to go along with the tender.  Correct?

A    Yes.  I would assume so.

Q    Do you know either way?

A    I don't specifically have knowledge, but I assume.  She's handling the case, so she would have picked the release.

Q    And she had Mr. Jarvis review the tender package; correct?

A    Yes.  I see the note on 2-28-17 at 4:41 p.m.  Correct.

Q    And then Mr. Flayman reviewed it and approved it?

A    Correct.

Q    And the release that was sent is a form available within the Word processing universe at Progressive.

A    Correct.

Q    It wasn't something that Miss Bertaloni made up on her own, or --

A    No.  She's an adjustor.  She's doesn't draft releases.  It's a form letter.

Q    And do you know whether that release on its face asks Janet and Norman Manning to release Edit -- I'm not even going to try it.  It's a Hungarian name; I'll show you the spelling -- and Max Mohr -- from all claims except as might be otherwise covered by their insurance.

A    If I could look at the release -- if you'd like me to.

Q    Sure.  I mean, the document says what it says. But do you know if that's what it said?

A    Yes.  The release itself does say Janet Manning and Norman Manning, for $10,000 -- yep.  That is correct.

Q    Now, do you know what an offer of judgment is?

A    Yes, I do.

Q    And what do you understand it to be?

A    It's a -- course I'm not an attorney, but it's a document that's put in a court proceeding where you offer to settle a case for a specific amount of money.

Q    Do you know if at some point proposals for settlement were authorized to be sent during the underlying litigation?

A    I didn't recall, but if you have a specific

face sheet note, I'd be glad to look at it for you.

Q    Do you know if on or around October 10 of 2018 Mr. -- do you know who John Wilke is?

A    Yes, I do.

Q    Who do you know him to be?

A    He is a outside defense attorney that Progressive uses in defense of some cases.

Q    Do you know whether on or about October 10 of 2018 he was authorized to make proposals for settlement to both Norman and Janet Manning?

MR. KISSANE:  Object to form.

THE WITNESS:  Again, if you give me a page number, I'll be glad to look at it.

BY MR. MARINO:

Q    I'm not looking at the claim notes right now, so I don't know, sir.  I'm just asking if you know whether or not that occurred during the life of the claim.

A    I don't know specifically, but I could certainly read the file.

Q    Mr. Wilke couldn't send a proposal like that without authorization from Progressive.  True?

MR. KISSANE:  Object to form.

THE WITNESS:  That would be correct.

BY MR. MARINO:

Q    Do you know whether anyone at Progressive had control over the language of the proposal, or the release that would go along with it?

A    Well, again, I don't know.  It was done by outside counsel; you said by Mr. Wilke, so I would assume Mr. Wilke would have control over it.

Q    Do you know if it had to be approved by -- well, is it Progressive's practice that before outside counsel can send a settlement proposal like that, that it gets reviewed internally at Progressive?

A    I don't think the specific language would be reviewed by Progressive, if it was constructed by outside counsel in the defense of a case.

Q    Okay.  So the authorization in terms of amounts would come from Progressive, but the specific wording, that would be with outside counsel.

A    Correct.

Q    Do you know when Progressive ultimately offered the $20,000 policy limits to Janet and Norman Manning?

MR. KISSANE:  Object to form.

THE WITNESS:  I'm not sure what you're asking me.  There was a proactive tender early in the file -- I think it was something, like, 20 business

days -- and then Mr. Manning was, after discovery came in supporting his injuries and his medical bills.

So I think it was two separate timeframes involved; one being a proactive, and one was getting the medical bills through discovery.

BY MR. MARINO:

Q    So from Progressive's perspective, there was never an intention to settle both the claims at the same time?

MR. KISSANE:  Object to form.

BY MR. MARINO:

Q    True?

A    No.  True.

Q    And with regard to Mrs. Manning's claim, Progressive tendered to her with language that would release both his and her claims; Mr. and Mrs. Manning's claims.  Correct?

A    The release does say that, but that was never the intention, and I think that's absurd to assert that.

MR. KISSANE:  And -- wait a second --

MR. MARINO:  Move to strike.

MR. KISSANE:  I just want to make sure he's -- are you finished?

THE WITNESS:  Yeah.  I think the cover letter

specifically says it's a proposed release, and it specifically says that the bodily injury liability limit is being tender to Janet Manning.  And it clearly says that it's a proposed release, not conditioned upon settlement -- actually, it says "proposed" three times.

Any objections to the language contained, please contact me -- that being the adjustor -- to make any changes.

So that was never the intent; to release both. It's pretty clear in the file, and pretty clear by this letter.

BY MR. MARINO:

Q    So that letter and the tender was never intended to have Norman Manning release his claims in their entirety.

A    No, of course not.  I mean, Progressive would nerve do anything like that, and Sabrina would never do anything like that.

Q    Anything like what?

A    Well, if your assertion is that somehow she was trying to defraud somebody by putting them both on a release -- I mean, Progressive would never do that, neither would any of my adjustors.

Q    I never used the word "fraud" or "defraud" or

anything like that.  I asked the question that I asked, which was --

A    It was never the intent.

Q    It was never the intent; correct?

A    Correct.  And I think this letter makes it very clear that it was never the intent.

MR. KISSANE:  Just for the record, sir, what letter are you referring to?  You can just read the exhibit number from the bottom.

THE WITNESS:  This is Exhibit 5.

MR. KISSANE:  All right.

MR. MARINO:  I think it was previously marked Exhibit 5.  It's the March 2nd letter.

MR. KISSANE:  Yeah.

BY MR. MARINO:

Q    That March 2nd, 2017 tender was rejected, and litigation filed; correct?

A    Correct.

Q    And ultimately a jury made determinations as to liability and damages; correct?

A    Correct.

Q    Was Progressive's evaluation of 20 percent on their insured consistent or inconsistent with what the jury found?

MR. KISSANE:  Objection.

THE WITNESS:  The jury found a different amount.

BY MR. MARINO:

Q    And ultimately did Progressive pay out its complete policy limits to -- of $20,000 to Norman and Janet Manning?

MR. KISSANE:  Object to form.

THE WITNESS:  Again, as I stated earlier, yes. One was proactive, and one was after discovery came in which supported the medical bills that he incurred.

BY MR. MARINO:

Q    And -- move to strike.

Is there presently pending a judgment against Progressive's insureds in favor of the Mannings?

MR. KISSANE:  Object to form.

THE WITNESS:  I'm sorry; what was the question?

BY MR. MARINO:

Q    Is there currently pending a judgment against Progressive's insureds in favor of the Mannings?

MR. KISSANE:  Same objection.

THE WITNESS:  I don't have any specific knowledge, but I would assume so.

BY MR. MARINO:

Q    Well, a judgment was entered following the jury trial; correct?

A    That's my understanding; yes.

Q    And that judgment has not yet been satisfied; correct?

A    I don't know, but I assume not.

Q    Now, at some point the insured had its own attorney. Do you recall that, from the file?

A    Yes, I did see that the insured had an attorney, and made a claim against Allstate.

Q    I should say their attorney; not its attorney. I apologize.

And that attorney wrote a letter -- give me a moment, sir, so I can reference it --

MR. MARINO:  Do you know if that was marked?

MR. KISSANE:  I don't believe it was.

MR. MARINO:  I don't know either, so let's just reference it by Bates number for now.

MR. KISSANE:  All right.

MR. MARINO:  This is Progressive 2824, and that's an August 23, 2017 letter.

Do we know what we're up to, in terms of Exhibit numbers?

MR. KISSANE:  I don't.

MR. MARINO: Let me find out.

BY MR. MARINO:

Q    Have you seen this letter before, sir?

A    No, I haven't.

Q    Do you know whether there was a response from Progressive to Mr. Grife -- G-R-I-F-E -- Mr. Grife's August 23rd, 2017 letter?

A    I don't know.

Q    Is it Progressive's practice to ignore letters from their insured's attorneys?

MR. KISSANE: Object to form.

THE WITNESS: No, of course it's not a practice.

BY MR. MARINO:

Q    So are you aware of any response from Progressive to Mr. Grife's comments in this letter?

MR. KISSANE: Objection. Asked and answered.

THE WITNESS: I don't know one way or another. I'd have to read through the file and specifically look when it was received, and whether or not they sent a response.

BY MR. MARINO:

Q    I'm going to show you what was marked as Exhibit 12 --

MR. MARINO: Apparently we started new Exhibit

numbers in each depo.

MR. KISSANE:  I don't mind if we go back and correct them.  You can just correct them as 1, 2, 3 or whatever.

MR. MARINO:  Why don't we mark that as 1 for this deposition, and we'll just go in sequence when we're done.

(Plaintiff's Exhibit 1 marked for identification)

BY MR. MARINO:

Q    Showing you what was marked as Exhibit 12, and the Bates number was covered, unfortunately, by the Exhibit sticker.  Although I think it's Progressive 779, September 20, 2017 letter to Mr. Grife from Brenda Sheffield.

Do you know whether this is the only response to Mr. Grife's August 23rd, 2017 letter?

A    I don't have any specific knowledge.

MR. MARINO:  Let me mark as Exhibit 2 for this deposition Progressive Bates Number 983, a letter dated March 28th, 2019, and that will be Exhibit 2 to this depo.

(Plaintiff's Exhibit 2 marked for identification)

BY MR. MARINO:

Q    Have you had a chance?

A    Yeah.

Q     Do you know whether Mr. Wilke or anyone at Progressive responded to that letter from Mr. Grife?

A     I don't have any specific knowledge of whether he did or not.

MR. MARINO:   I have no further questions at this time, sir.

MR. KISSANE:   I have no questions.

We will read.

THE VIDEOGRAPHER:   This is the end of the deposition.   The time is 12:44; going off the record.

- - -

THE REPORTER:   Counsel, you going to order this today?

MR. MARINO:   Yes, Ma'am.

THE REPORTER:   Mr. Kissane, do you want to order copy?

MR. KISSANE:   I do.

THE REPORTER:   Okay.

(THE DEPOSITION WAS CONCLUDED AT 12:44 P.M.)

- - -